MICHAEL C. VAN, ESQ.
Nevada Bar No. 3876
GARRETT R. CHASE, ESQ.
Nevada Bar No. 14498
**SHUMWAY VAN**
8985 S. Eastern Ave., Suite 100
Las Vegas, Nevada 89123
Telephone: (702) 478-7770
Facsimile: (702) 478-7779
Email: michael@shumwayvan.com
garrett@shumwayvan.com
*Attorneys and Local Counsel for Plaintiffs*

FARHAD NOVIAN (California Bar No. 118129; will comply with LR IA 11-2 within 14 days to be admitted pro hac vice for this case)
*farhad@novianlaw.com*
ANDREW B. GOODMAN (California Bar No. 267972; will comply with LR IA 11-2 within 14 days to be admitted pro hac vice for this case)
*agoodman@novianlaw.com*
ALEXANDER B. GURA (California Bar No. 305096; will comply with LR IA 11-2 within 14 days to be admitted pro hac vice for this case)
*gura@novianlaw.com*
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, CA  90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MARIA TSATAS, an individual; LEONIDAS VALKANAS, as trustee of the KEET TRUST dated August 1, 2015; RAYMOND BARAZ, an individual; PASCAL ABDALLAH, an individual; JIMMY TSOUTSOURAS, an individual; FOTINI VENETIS, an individual; NICHOLAS TSOUTSOURAS, an individual; CONNIE TSOUTSOURAS, an individual; RAYMONDE KANHA, an individual; ALFRED BEKHIT, an individual; JACQUEZ ELBAZ, an individual; MARTINE BENEZRA, an individual; JAMES P. CARROLL, an individual; DAVID CHIN, an individual; JENNIFER MILLS, an individual; PAUL SUBLETT, an individual; ANDREW SUBLETT, an individual; MANOLIS KOSTAKIS, an individual; ESTHER GEORGAKOPOULOS, an individual; EVAGELIA KOSTAKIS, an individual; | CASE NO.: <br><br>**COMPLAINT FOR:** <br><br> 1. **FRAUD** <br> 2. **BREACH OF FIDUCIARY DUTY** <br> 3. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** <br> 4. **CONVERSION** <br> 5. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** <br> 6. **BREACH OF CONTRACT** <br><br> **JURY DEMAND** |

DENIS PARSONS, an individual; SOFIA KARDARAS, an individual; JIMMY ASMAKLIS, an individual; CORRADINO GALUPPO, an individual; DENIS KOPITAS, an individual; TERRY TSATAS, an individual; GEORGE TSATAS, an individual; PANAGIOTA TSATAS, an individual; OURANIA TSATAS, an individual; KIRIAKOS PRIMBAS, an individual; EVANTHIA PRIMBAS, an individual; PATRICK AYOUB, an individual; MICHAEL BESCEC, an individual; ERNEST LEBOEUF, an individual; PHILIPPE LEGAULT, an individual; EFTIHIOS LITSAKIS, an individual; GIOVANNI MONCADA, an individual; MARC RIEL, an individual; JARADEH SALIM, an individual; HANI HAMAM, an individual; CONSTANTIN ZISSIS, an individual; BESSIE PEPPAS, an individual; NIKI PALIOVRAKAS, an individual,

          Plaintiffs,

v.

AIRBORNE WIRELESS NETWORK, INC., a Nevada Corporation; MICHAEL J. WARREN, an individual; J. EDWARD DANIELS, an individual; MARIUS DE MOS, an individual; JASON DE MOS, an individual; ROBERT BRUCE HARRIS, an individual; KELLY KABILAFKAS, an individual; and APCENTIVE, INC., a Nevada Corporation,

          Defendants.

## THE PARTIES

1.      Plaintiff MARIA TSATAS ("Maria Tsatas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

2.      Plaintiff LEONIDAS VALKANAS ("Valkanas"), as trustee of the KEET TRUST dated August 1, 2015 ("KEET Trust") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada. The KEET Trust was formed on August 1, 2015 in Montreal, Quebec, Canada, and is governed by the laws of the Province of Quebec, Canada.

3.      Plaintiff RAYMOND BARAZ ("Baraz") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

4. Plaintiff PASCAL ABDALLAH ("Abdallah") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

5. Plaintiff JIMMY TSOUTSOURAS ("Jimmy Tsoutsouras") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

6. Plaintiff FOTINI VENETIS ("Venetis") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

7. Plaintiff NICHOLAS TSOUTSOURAS ("Nicholas Tsoutsouras") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

8. Plaintiff CONNIE TSOUTSOURAS ("Connie Tsoutsouras") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

9. Plaintiff RAYMONDE KANHA ("Kanha") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

10. Plaintiff ALFRED BEKHIT ("Bekhit") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

11. Plaintiff JACQUEZ ELBAZ ("Elbaz") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

12. Plaintiff MARTINE BENEZRA ("Benezra") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

13. Plaintiff JAMES P. CARROLL ("Carroll") is an individual who, at all relevant times, resided in Shelbourne, Vermont.

14. Plaintiff DAVID CHIN ("Chin") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

15. Plaintiff JENNIFER MILLS ("Mills") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

16. Plaintiff PAUL SUBLETT ("Paul Sublett") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

17. Plaintiff ANDREW SUBLETT ("Andrew Sublett") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

18. Plaintiff MANOLIS KOSTAKIS ("Manolis Kostakis") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

19. Plaintiff ESTHER GEORGAKOPOULOS ("Georgakopoulos") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

20. Plaintiff EVAGELIA KOSTAKIS ("Evagelia Kostakis") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

21. Plaintiff DENIS PARSONS ("Parsons") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

22. Plaintiff SOFIA KARDARAS ("Kardaras") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

23. Plaintiff JIMMY ASMAKLIS ("Asmaklis") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

24. Plaintiff CORRADINO GALUPPO ("Galuppo") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

25. Plaintiff DENIS KOPITAS ("Kopitas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

26. Plaintiff TERRY TSATAS ("Terry Tsatas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

27. Plaintiff GEORGE TSATAS ("George Tsatas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

28. Plaintiff PANAGIOTA TSATAS ("Panagiota Tsatas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

29. Plaintiff OURANIA TSATAS ("Ourania Tsatas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

30. Plaintiff KIRIAKOS PRIMBAS ("Kiriakos Primbas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

31. Plaintiff EVANTHIA PRIMBAS ("Evanthia Primbas") is an individual who, at all relevant times, resided in Laval, Quebec, Canada.

32. Plaintiff PATRICK AYOUB ("Ayoub") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

33. Plaintiff MICHAEL BESCEC ("Bescec") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

34. Plaintiff ERNEST LEBOEUF ("Leboeuf") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

35. Plaintiff PHILIPPE LEGAULT ("Legault") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

36. Plaintiff EFTIHIOS LITSAKIS ("Litsakis") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

37. Plaintiff GIOVANNI MONCADA ("Moncada") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

38. Plaintiff MARC RIEL ("Riel") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

39. Plaintiff JARADEH SALIM ("Salim") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

40. Plaintiff HANI HAMAM ("Hamam") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

41. Plaintiff CONSTANTIN ZISSIS ("Zissis") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

42. Plaintiff BESSIE PEPPAS ("Peppas") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

43. Plaintiff NIKI PALIOVRAKAS ("Paliovrakas") is an individual who, at all relevant times, resided in Montreal, Quebec, Canada.

44. Defendant AIRBORNE WIRELESS NETWORK, INC. ("ABWN") is a publicly traded corporation organized and existing under the laws of the State of Nevada, with its principal place of business at 4115 Guardian Street, Suite C, Simi Valley, State of California.

45. Defendant MICHAEL J. WARREN ("Warren") is and was, at all relevant times,

an individual and the CEO of ABWN, who, at all relevant times, upon information and belief, resided in Mooresville, North Carolina.

46. Defendant J. EDWARD DANIELS ("Daniels") is and was, at all relevant times, an individual and the President of ABWN, who, at all relevant times, upon information and belief, resided in Agoura Hills, California.

47. Defendant MARIUS DE MOS ("Marius De Mos") is and was, at all relevant times, an individual and the Vice President of Technical Affairs & Development at ABWN, who, at all relevant times, upon information and belief, resided in Moorpark, California.

48. Defendant JASON DE MOS ("Jason De Mos") is and was, at all relevant times, an individual and the Vice President of Business Development & Aviation Compliance at ABWN, who, at all relevant times, upon information and belief, resided in Moorpark, California.

49. Defendant ROBERT BRUCE HARRIS ("Harris") is and was, at all relevant times, an individual, who, at all relevant times, upon information and belief, resided in Huntington Beach, California.

50. Defendant KELLY KABILAFKAS ("Kabilafkas") is and was, at all relevant times, an individual, who, at all relevant times, upon information and belief, resided in Moorpark, California.

51. APCENTIVE, INC. ("Apcentive") is a corporation organized and existing under the laws of the State of Nevada, with a principal place of business in Huntington Beach, California.

52. On July 31, 2016, Apcentive entered into an Intellectual Property Purchase Agreement with ABWN, whereby ABWN purchased Apcentive's patent (U.S. Patent No. 6285878, and all related support materials, continuations, amendments, updates, and contemplated updates and/or amendments) and trademark (for the "Infinitus Super Highway") in exchange for forty-million shares of ABWN's $0.001 par value common stock (hereafter, the "Intellectual Property Purchase Agreement").

53. Harris is the President of Apcentive who signed the Intellectual Property Purchase Agreement with ABWN on behalf of Apcentive. Daniels was the signatory to this agreement on behalf of ABWN. Kabilafkas was, upon information and belief, a so-called Shareholder's

Representative and in a position of control within Apcentive at all relevant times. A true and correct copy of the Intellectual Property Purchase Agreement is attached to this Complaint as **Exhibit 1**.

## INVESTOR GROUPS AND TOTAL SHARES

54. The plaintiffs named in paragraphs 1 to 43 herein were shareholders of Apcentive whose shares in Apcentive were exchanged for ABWN shares (collectively, the plaintiffs named in paragraphs 1 to 43 herein shall be referred to as "Plaintiffs"). Plaintiffs were organized into groups with the following investors, dollar amounts, and share numbers:

   a. The Jimmy Tsoutsouras Group (Baraz, Abdallah, Jimmy Tsoutsouras, Venetis, Nicholas Tsoutsouras, Connie Tsoutsouras, Kanha, Behkit, Elbaz, Benezra, and Carroll) purchased, through private placement (Apcentive), a total of approximately 328,320 (converted/open market) ABWN shares for $239,000.00.

   b. The Dennis Kopitas Group (Galuppo and Kopitas) purchased, through private placement (Apcentive) and the open market (ABWN), a total of approximately 127,680 (converted/open market) ABWN shares for $73,000.00.

   c. The Manolis Kostakis Group (Chin, Mills, Paul Sublett, Andrew Sublett, Manolis Kostakis, Georgakopoulos, Evagelia Kostakis, Parsons, Kardaras, and Asmaklis) purchased, through private placement (Apcentive) and the open market (ABWN), a total of approximately 159,486 (converted/open market) ABWN shares for $149,950.00.

   d. The Maria Tsatas Group (Maria Tsatas, Terry Tsatas, George Tsatas, Panagiota Tsatas, Ourania Tsatas, Kiriakos Primbas, and Evanthia Primbas) purchased, through private placement (Apcentive) and the open market (ABWN), a total of approximately 185,820 (converted/open market) ABWN shares for $239,500.00.

   e. The KEET Trust Group (KEET Trust, Ayoub, Bescec, Leboeuf, Legault, Litsakis, Moncada, Riel, Salim, Hamam, Zissis, Peppas, Paliovrakas) purchased, through private placement (Apcentive), a total of approximately 778,164 (converted) ABWN shares for $341,300.00.

**JURISDICTION AND VENUE**

55. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because (a) there is complete diversity of the parties (*see generally* paragraphs 1 to 51, above), and (b) the amount in controversy exceeds $75,000.00 (*see generally* paragraph 52, above).

56. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because ABWN resides in this District. In addition, Article VII, Section 6 of the Amended and Restated Bylaws of ABWN (as amended and restated as of July 30, 2017), contains forum-selection language for venue in a court of competent jurisdiction sitting in the State of Nevada:

> To the fullest extent permitted by law, and unless the corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for any or all actions, suits or proceedings, whether civil, administrative or investigative or that asserts any claim or counterclaim (each, an "Action"): (a) brought in the name or right of the corporation or on its behalf; (b) ***asserting a claim for breach of any fiduciary duty owed by any director, officer, employee or agent of the corporation to the corporation or the corporation's stockholders***; (c) arising or asserting a claim arising pursuant to any provision of NRS Chapters 78 or 92A or any provision of the corporation's Articles of Incorporation or these bylaws; (d) to interpret, apply, enforce or determine the validity of the corporation's Articles of Incorporation or these bylaws; or (v) ***asserting a claim governed by the internal affairs doctrine***, ***shall be a court of competent jurisdiction sitting in the State of Nevada***.
>
> https://www.sec.gov/Archives/edgar/data/1537258/000164033417001497/atlw_ex32.htm (emphases added).

57. Personal jurisdiction is proper over ABWN and Apcentive because they reside within this District. As directors and officers of ABWN subject to Article VII, Section 6 of the Amended and Restated Bylaws of ABWN (as amended and restated as of July 30, 2017), Warren, Daniels, Marius De Mos, and Jason De Mos have consented to personal jurisdiction within this District. Personal jurisdiction is additionally proper over Warren, Daniels, Marius De Mos, and

Jason De Mos because (1) they have purposefully directed their activities toward residents of Nevada (ABWN) and otherwise established contacts with Nevada as directors and officers of a Nevada corporation (ABWN); (2) Plaintiffs' claims arise out of Warren, Daniels, Marius De Mos, and Jason De Mos' forum-related contacts vis a vis ABWN; and (3) it comports with fair play and substantial justice for this District to exercise personal jurisdiction over Warren, Daniels, Marius De Mos, and Jason De Mos, especially considering that Plaintiffs and Assignors are residents of Laval and Montreal, Quebec, Canada; and Shelbourne, Vermont. Likewise, personal jurisdiction is proper over Harris and Kabilafkas because (1) they have purposefully directed their activities toward residents of Nevada (Apcentive) and otherwise established contacts with Nevada as directors and control persons of a Nevada corporation (Apcentive); (2) Plaintiffs' claims arise out of Harris and Kabilafkas' forum-related contacts vis a vis Apcentive; and (3) it comports with fair play and substantial justice for this District to exercise personal jurisdiction over Harris and Kabilafkas, especially considering that Plaintiffs are residents of Laval and Montreal, Quebec, Canada; and Shelbourne, Vermont.

## BACKGROUND ALLEGATIONS

58. Valkanas was introduced to Harris on or around August 20, 2015 and learned about a potential private placement opportunity in Apcentive. Apcentive was the developer of a fully meshed airborne network which uses aircraft as "mini-satellites."

59. On August 31, 2015, the KEET Trust entered into a written consulting agreement with Apcentive via Harris (the "Consulting Agreement"). Pursuant to the Consulting Agreement, the KEET Trust was to render strategic advisory services, including: assisting Apcentive in developing a business, corporate structure, and marketing strategy; assisting Apcentive in developing an acquisition strategy and structure; making introductions to potential funding sources and customers; and other services as mutually agreed to by Apcentive and the KEET Trust. The KEET Trust's period of engagement began on August 31, 2015 and was set to expire after 18 months, unless mutually extended by the parties. The KEET Trust was to receive in compensation from Apcentive: (1) a finder's fee equal to the cash equivalent of 10% of any funding procured from the KEET Trust's introductions; (2) one option per each share purchased to cash, to be vested

1  immediately at closing of each transaction, with a 3-year expiration date and the exercise price to
2  be equivalent to the price the shares were purchased at (50 cents); (3) additional cash payments
3  and/or additional shares to the KEET Trust based upon the KEET Trust's performance; and (4)
4  reimbursement for all prior approved expenses.

5  60.  On or around November 12, 2015, Apcentive made a presentation to Maria Tsatas
6  and several of her colleagues. Marius de Mos and Kabilafkas were a part of this presentation.

7  61.  In or around December 2015, Plaintiffs began purchasing shares in Apcentive
8  through KEET Trust's introductions. Valkanas was the primary point of contact for the investors.

9  62.  On or around February 10, 2016, Apcentive updated its investors regarding a
10 potential partnership with a global communications and information company for building and
11 managing Apcentive's earth stations.

12 63.  On or around June 2, 2016, Kabilafkas asked for Maria Tsatas' assistance in
13 securing an agreement with a global communications and information company for building and
14 managing Apcentive's earth stations.

15 64.  On or around July 31, 2016, ABWN purchased the intellectual property of
16 Apcentive for consideration of 40 million shares of ABWN at $0.001 par value common stock.
17 Upon information and belief, one certificate for the entire 40 million shares was issued to
18 Apcentive. There were numerous shareholders (Plaintiffs and others) who owned Apcentive
19 shares, however, and there was no proposal for how to split the single 40-million share certificate
20 among the shareholders.

21 65.  Apcentive continued to receive subscriptions and funds in excess of $500,000.00
22 from August 2016 to February 2017, even though the intellectual property was sold to ABWN on
23 July 31, 2016. Harris and Kabilafkas asked Valkanas to continue procuring investors until a new
24 subscription form for ABWN became available. This was beneficial to new investors as they
25 continued to have the opportunity to purchase stock at 50 cents per share when stock was trading
26 at a much higher price in the open market.

27 66.  ABWN stock was trading at $1.40 per share on NASDAQ at the end of July 2016.
28 67.  ABWN stock was trading at $0.89 cents per share at the end of August 2016.

68. ABWN stock was trading at $1.40 per share at the end of December 2016.

69. ABWN stock reached $4.01 per share on or around February 23, 2017.

70. In February 2017, Valkanas was advised that ABWN would not honor the Consulting Agreement. In an effort to propose a solution, Kabilafkas suggested an opportunity to purchase shares held by a company purportedly owned by himself, Marius de Mos, Harris, and Daniels called "Broadband Inv. Class, III" ("Broadband").

71. On or around February 28, 2017, Valkanas expressed concern to Kabilafkas about needing to purchase the shares, whereas under the original agreement between Apcentive and the KEET Trust, Valkanas had the opportunity for a cashless exercise. Valkanas suggested an alternative solution.

72. On or around April 5, 2017, ABWN stock was trading at $3.08 per share.

73. On or around May 9, 2017, Valkanas emailed Kabilafkas to resume discussions about options of Apcentive via a share purchase agreement with Broadband.

74. On or around July 6, 2017, Harris wrote an update to Apcentive shareholders that Apcentive was in the process of exchanging their private shares in Apcentive stock for publicly traded shares of ABWN. The exchange was to occur at a rate of 1.14 for every 1 share currently owned (i.e., 100 shares of Apcentive = 114 shares of ABWN).

75. On or around August 17, 2017, upon information and belief, some investors began receiving ABWN shares by registered U.S. Postal Service from ABWN's transfer agent. The certificates were "restricted" for 3 years even though a year had lapsed since the agreement whereby ABWN purchased the intellectual property of Apcentive.

76. Between August 2017 to December 2017, ABWN stock was hovering between $2.00 and $1.00 per share and then increased to above $3.00 per share at the end of December 2017 to the beginning of January 2018.

77. Between approximately September 5, 2017 and November 2017, Valkanas was working to finalize the terms of the Broadband agreement to purchase shares.

78. On or around September 27, 2017, Valkanas received a new ABWN investor package from Daniels, which stated that ABWN signed agreements with several strategic partners.

ABWN signed agreements with Air Lease Corporation (AL), In-flight Canada (IFC), and Jet Midwest Group (JMG).

79. On or around September 29, 2017, Daniels sent a promising email to Valkanas about ABWN filing an application with the NEO Exchange in Canada.

80. Upon information and belief, Daniels and ABWN were sending positive news to keep investors, such as Plaintiffs, calm about the restrictions on their ABWN shares and give them hope about the future of the company, while, upon information and belief, they were making millions behind everyone's back.

81. Throughout September and October 2017, Daniels told Valkanas numerous times that, although the ABWN certificates have a restriction, investors should deposit the certificates with their broker, and Daniels will send a letter to the clearing office to lift the restrictions. Daniels never sent such a letter or otherwise lifted the restrictions.

82. On or around November 3, 2017, Valkanas found out that Broadband no longer existed. The Broadband agreement to purchase shares was never ultimately signed. In the meantime, however, the stock price for ABWN was still holding and Valkanas kept receiving seemingly promising news about ABWN from Daniels and the ABWN team.

83. ABWN stock sustained a price of about $2.00 per share from January to March 2018.

84. Between March to May 2018, ABWN stock steadily declined from approximately $2.00 per share to about 50 cents per share.

85. On or around May 23 to 24, 2018, ABWN stock sharply declined to approximately 24 cents per share.

86. After May 24, 2018 and in early summer 2018, to reduce their losses, Plaintiffs were forced to purchase additional ABWN shares in the open market.

87. By around June 11, 2018, ABWN stock was trading at approximately 12 cents per share.

88. By around June 22, 2018, ABWN stock was under a penny.

89. On or around June 29, 2018, upon information and belief, ABWN declared a

dividend. Plaintiffs never received a dividend.

90. On or around August 27, 2018, ABWN caused a reverse stock split of 1:30,000. This came as a complete surprise to Plaintiffs.

91. The share price of ABWN stock continued to decline after the reverse stock split, despite the company apparently continuing to meet its plans from an operational perspective.

92. On or around October 10, 2018, the KEET Trust, through counsel, wrote a demand letter to Warren, Daniels, Marius De Mos, and Jason De Mos. At this point, Plaintiffs learned that ABWN shares issued to AL and JMC contained no restrictions, in contrast to the ABWN shares issued to Plaintiffs. The initial subscription agreement with Apcentive likewise contained no restriction period. Moreover, AL and JMC had anti-dilution protection for their ABWN shares. Plaintiffs were never offered anti-dilution protection for their ABWN or Apcentive shares. Plaintiffs demanded the same anti-dilution protection for: (1) the 1,450,000 common shares of ABWN purchased in the private placement of Apcentive; (2) the 1,450,000 options held by the KEET Trust under the Consulting Agreement; (3) the 578,303 ABWN shares held by the KEET Trust; and (4) the 12,500,000 common shares of ABWN purchased in the open market by the Plaintiffs. ABWN refused to grant such anti-dilution protection.

93. Plaintiffs subsequently learned that the officers, directors, and control persons of Apcentive and ABWN did not have any restrictions on their ABWN shares and similarly had anti-dilution protection. As such, Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas were able to freely sell or trade their shares from the same $40 million certificate when ABWN purchased the intellectual property of Apcentive on July 31, 2016.

94. ABWN continues to operate according to plan to bring its fully meshed airborne network technology to market. Nonetheless, Plaintiffs were restricted from reaping the benefits of the ABWN intellectual property purchase agreement, while Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas underhandedly rigged the transaction to their advantage.

///

///

///

**FIRST CAUSE OF ACTION**

**(For Fraud, against defendants ABWN, Apcentive, Harris, and Daniels)**

95. Plaintiffs hereby re-allege, and incorporate herein, each and every allegation of paragraphs 1 through 94, inclusive, as though fully set forth herein.

96. On July 31, 2016, ABWN and Apcentive, via their respective Presidents, Harris and Daniels, represented in writing to Plaintiffs at paragraph 4.11 of the Intellectual Property Purchase Agreement that:

> Seller understands that the shares constituting the Stock Payment and the Subsequent Stock Payment, if made, have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Seller's representations as expressed herein. Seller understands that the shares constituting the Stock Payment are 'restricted securities' under applicable federal and state securities laws and that, pursuant to these laws, Seller must hold those shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.

97. These representations were false when made, or made recklessly and without regard for the truth, because, in actuality, not all ABWN shares issued in connection with the Intellectual Property Purchase Agreement contained restrictions. Although Plaintiffs had restrictions on their ABWN shares, Warren, Daniels, Marius De Mos, Jason De Mos, Harris, Kabilafkas, AL, and JMC did not have such restrictions.

98. ABWN and Apcentive, via their respective Presidents, Harris and Daniels, knew that section 4.11 of the Intellectual Property Purchase Agreement was false when made, or made recklessly and without regard for the truth, because they intended to profit from the transaction at the expense of other investors, whose shares were restricted.

99. Throughout September and October 2017, Daniels told Valkanas numerous times that, although the ABWN certificates have a restriction, investors should deposit the certificates with their broker, and Daniels will send a letter to the clearing office to lift the restrictions. Daniels never sent such a letter or otherwise lifted the restrictions, however. Instead, Daniels lulled Plaintiffs into a false sense of security that the future of ABWN was bright and that they should hold onto their shares.

100. ABWN and Apcentive, via their respective Presidents, Harris and Daniels, intended Plaintiffs to refrain from selling or attempting to sell their ABWN shares.

101. Plaintiffs justifiably relied on the representations of ABWN and Apcentive, via their respective Presidents, Harris and Daniels; but for the written representation under section 4.11 of the Intellectual Property Purchase Agreement and Daniels' subsequent assurances about the future of ABWN, Plaintiffs would have attempted to sell their ABWN shares while the stock was trading around $3.00 per share.

102. Plaintiffs' reasonable and justifiable reliance on the false representations of ABWN, Apcentive, Harris, and Daniels was a substantial factor in causing significant economic losses to Plaintiffs in an amount to be proven at trial.

103. ABWN, Apcentive, Harris, and Daniels misrepresented and concealed facts from Plaintiffs with the intention of depriving them of property or legal rights, and otherwise causing injury.

104. ABWN, Apcentive, Harris, and Daniels engaged in despicable conduct which was carried on with such a willful and conscious disregard of Plaintiffs' rights, and which has subjected Plaintiffs to cruel and unjust hardship.

105. Accordingly, Plaintiffs are entitled to punitive and exemplary damages against ABWN, Apcentive, Harris, and Daniels.

///
///
///
///

## SECOND CAUSE OF ACTION

**(For Breach of Fiduciary Duty, against defendants Warren, Daniels, Marius De Mos, and Jason De Mos)**

106. Plaintiffs hereby re-allege, and incorporate herein, each and every allegation of paragraphs 1 through 105, inclusive, as though fully set forth herein.

107. As directors and officers of ABWN, Warren, Daniels, Marius De Mos, and Jason De Mos owe fiduciary duties of loyalty to shareholders, such as Plaintiffs, to maintain in good faith the shareholder's best interests over anyone else's interests.

108. Warren, Daniels, Marius De Mos, and Jason De Mos breached their fiduciary duties to Plaintiffs by fraudulently misrepresenting that all shares of ABWN issued pursuant to the Intellectual Property Purchase Agreement were restricted, when, in fact, Warren, Daniels, Marius De Mos, Jason De Mos, Harris, Kabilafkas, AL, and JMC did not have such restrictions.

109. Warren, Daniels, Marius De Mos, and Jason De Mos' breaches of their fiduciary duties of loyalty to Plaintiffs involved intentional misconduct and fraud, whereby Warren, Daniels, Marius De Mos, and Jason De Mos were able to sell their ABWN shares at significant profits that Plaintiffs were restricted from attaining.

110. Warren, Daniels, Marius De Mos, and Jason De Mos' breaches of their fiduciary duties of loyalty to Plaintiffs were substantial factors in causing significant economic losses to Plaintiffs in an amount to be proven at trial.

111. Warren, Daniels, Marius De Mos, and Jason De Mos misrepresented and concealed facts from Plaintiffs with the intention of depriving them of property or legal rights, and otherwise causing injury.

112. Warren, Daniels, Marius De Mos, and Jason De Mos engaged in despicable conduct which was carried on with such a willful and conscious disregard of Plaintiffs' rights, and which has subjected Plaintiffs to cruel and unjust hardship.

113. Accordingly, Plaintiffs are entitled to punitive and exemplary damages against Warren, Daniels, Marius De Mos, and Jason De Mos.

///

## THIRD CAUSE OF ACTION

**(For Aiding and Abetting Breach of Fiduciary Duty, against defendants Harris and Kabilafkas)**

114. Plaintiffs hereby re-allege, and incorporate herein, each and every allegation of paragraphs 1 through 113, inclusive, as though fully set forth herein.

115. As directors and officers of ABWN, Warren, Daniels, Marius De Mos, and Jason De Mos owe fiduciary duties of loyalty to shareholders, such as Plaintiffs, to maintain in good faith the shareholder's best interests over anyone else's interests.

116. Warren, Daniels, Marius De Mos, and Jason De Mos breached their fiduciary duties to Plaintiffs by fraudulently misrepresenting that all shares of ABWN issued pursuant to the Intellectual Property Purchase Agreement were restricted, when, in fact, Warren, Daniels, Marius De Mos, Jason De Mos, Harris, Kabilafkas, AL, and JMC did not have such restrictions.

117. Harris and Kabilafkas knowingly participated in Warren, Daniels, Marius De Mos, and Jason De Mos' breaches of their fiduciary duties because they likewise were able to sell their ABWN shares at significant profits that Plaintiffs were restricted from attaining.

118. Warren, Daniels, Marius De Mos, and Jason De Mos' breaches of their fiduciary duties of loyalty to Plaintiffs were substantial factors in causing significant economic losses to Plaintiffs, in an amount to be proven at trial, and Harris and Kabilafkas knowingly participated in these breaches. Accordingly, Plaintiffs are entitled to punitive and exemplary damages against Harris and Kabilafkas.

## FOURTH CAUSE OF ACTION

**(For Conversion, against defendants Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas)**

119. Plaintiffs hereby re-allege, and incorporate herein, each and every allegation of paragraphs 1 through 118, inclusive, as though fully set forth herein.

120. Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas wrongfully exerted dominion and control over the single certificate issued to Apcentive shareholders pursuant to the Intellectual Property Purchase Agreement.

121. Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas committed acts in denial of Plaintiffs' rightful use and enjoyment of their ABWN shares by restricting Plaintiffs' ABWN shares, but not restricting their own.

122. As a proximate result of Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas' acts in derogation, exclusion, and defiance of Plaintiffs' rightful use and enjoyment of their ABWN shares, Plaintiffs suffered significant economic losses in an amount to be proven at trial.

123. Accordingly, Plaintiffs are entitled to punitive and exemplary damages against Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas.

## FIFTH CAUSE OF ACTION

**(For Intentional Interference with Contractual Relations, against defendants Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas)**

124. Plaintiffs hereby re-allege, and incorporate herein, each and every allegation of paragraphs 1 through 123, inclusive, as though fully set forth herein.

125. The Consulting Agreement was a valid and existing contract between the KEET Trust and Apcentive.

126. Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas had knowledge of the Consulting Agreement or had reason to know of its existence.

127. Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas committed intentionally fraudulent acts intended or designed to disrupt the Consulting Agreement, namely the KEET Trust's options and compensation thereunder.

128. Apcentive and Airborne have breached the Consulting Agreement as a result of Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas' wrongful and unjustified misconduct.

129. As a proximate result of Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas' wrongful and unjustified misconduct, KEET Trust suffered significant economic losses in an amount to be proven at trial.

130. Accordingly, KEET Trust is entitled to punitive and exemplary damages against Warren, Daniels, Marius De Mos, Jason De Mos, Harris, and Kabilafkas.

## SIXTH CAUSE OF ACTION

**(For Breach of Contract, against defendants Apcentive and ABWN)**

131. Plaintiffs hereby re-allege, and incorporate herein, each and every allegation of paragraphs 1 through 130, inclusive, as though fully set forth herein.

132. The Consulting Agreement is a valid written contract between the KEET Trust and Apcentive. Upon information and belief, the Consulting Agreement was transferred to ABWN as an asset or liability.

133. Apcentive, or, in the alternative, ABWN, failed to render payments or allow the exercise of options under the Consulting Agreement and refused to recognize its existence, despite its continued binding effect.

134. Apcentive, or, in the alternative, ABWN's breach of the Consulting Agreement and failure of performance thereunder was unexcused.

135. The KEET Trust fulfilled all conditions under the Consulting Agreement that were conditions precedent to Apcentive, or, in the alternative, ABWN's duty to perform.

136. As a proximate result of Apcentive, or, in the alternative, ABWN's breaches of the Consulting Agreement, KEET Trust suffered significant economic losses in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For compensatory, benefit-of-the bargain damages in an amount according to proof at trial;
2. For exemplary and/or punitive damages;
3. For pre-judgment and post-judgment interest;
4. For attorneys' fees and costs incurred by Plaintiffs; and
5. For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues raised in this Complaint.

**COMPLIANCE WITH LR IA 11-2 WITHIN 14 DAYS**

Plaintiffs' counsel, Messers. Novian, Goodman, and Gura, will comply with LR IA 11-2 within 14 days of the filing of this Complaint.

DATED: November 4, 2020

                              Respectfully submitted.

                              SHUMWAY VAN

By: */s/ Michael C. Van*
     MICHAEL C. VAN, ESQ. #3876
     GARRETT R. CHASE, ESQ. #14498
     8985 S. Eastern Ave., Suite 100
     Las Vegas, Nevada 89123
     *Attorneys for Plaintiffs*

SHUMWAY·VAN
8985 South Eastern Avenue, Suite 100
Las Vegas, Nevada 89123
Telephone: (702) 478-7770 Facsimile: (702) 478-7779