1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MARIA TSATAS, *et. al.*,

Plaintiffs,

v.

AIRBORNE WIRELESS NETWORK, INC., *et al.*,

Defendants.

Case No. 2:20-cv-02045-RFB-BNW

**ORDER**

Before the Court are Plaintiffs' Motions to Strike (ECF Nos. 268, 270), Motion for Partial Summary Judgment (ECF No. 274), and unopposed Motion to Seal Documents (ECF No. 321). For the following reasons, the Court denies Plaintiffs' Motions to Strike, denies Plaintiffs' Motion to Seal, and grants in part and denies in part Plaintiffs' Motion for Partial Summary Judgment.

## I.    RELEVANT PROCEDURAL HISTORY

The Court only summarizes the procedural history relevant to the instant Motions.

Plaintiffs are shareholders of Defendant Airborne Wireless Network, Inc. ("Airborne") who bring claims for fraud and breach of fiduciary duty against Airborne and Apcentive, Inc. ("Apcentive") and corporate officers and directors Michael J. Warren, J. Edward Daniels, Marius De Mos ("M. De Mos"),[1] Jason De Mos ("J. De Mos"), and Robert Bruce Harris.[2] Plaintiffs also

---

[1] Plaintiffs have informed the Court that M. De Mos is deceased, and they have not moved to substitute his estate. Therefore, the Court considers M. De Mos as a material fact witness in this action, but not a Defendant for purposes of the pending Motions.

[2] Based on the allegations and nature of this proceeding, although it appears that Plaintiff-shareholders have not formally pled their claims as derivative, the Court construes the shareholder claims arising from alleged violations of the fiduciary duties of Defendant corporate officers and directors which resulted in the diminution of the value of Plaintiffs' Airborne stock as derivative claims on behalf of Airborne Wireless Network, Inc. See Brunk v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark, 135 Nev. 620, 449 P.3d 1270 (2019) (explaining the inquiry for direct versus

1    bring a claim for aiding and abetting breach of fiduciary duty against Defendants Kelly Kabilafkas,

2    who was not a corporate officer or director, and Harris. Plaintiff Leonidas Valkanas brings a claim

3    for intentional interference with contractual relations against Defendants Kabilafkas, Daniels, and

4    Harris and breach of contract against Apcentive.

5        On November 5, 2020, Plaintiffs filed their Complaint commencing this lawsuit. (ECF No.

6    1). On December 21, 2023, Defendants filed a Motion to Dismiss ten shareholder Plaintiffs for

7    lack of prosecution. (ECF No. 236). On September 29, 2024, the Court granted the Motion, and

8    the ten Plaintiffs were dismissed. (ECF No. 295).

9        On June 12, 2024, the remaining Plaintiffs filed a Motion for Leave to file their Partial

10   Summary Judgment Motion and Motions to Strike. (ECF No. 267). On the same day, Plaintiffs

11   filed their Motion to Exclude the Expert Testimony and/or Report of Defendants' expert witness

12   J. Armand Musey and rebuttal expert witness Joseph G. Emanuele under Daubert ("Daubert

13   Motions"). (ECF Nos. 268, 270). As indicated on the docket, responses were due by June 26, 2024.

14   Id. Defendants did not timely oppose the Daubert Motions, and Plaintiffs filed a Notice of Non-

15   Opposition on July 2, 2024. (ECF No. 280). On July 19, 2024, Defendants belatedly filed

16   Oppositions to Plaintiffs' Daubert Motions, which simply copy and pasted aspects of their experts'

17   opinions and did not respond to the Plaintiffs' legal arguments. (ECF Nos. 282, 284). Nor did the

18   Oppositions address Defendants' failure to file by the deadline. Id.

19       Also on June 12, 2024, Plaintiffs filed their Motion for Partial Summary Judgment. (ECF

20   No. 274). Plaintiffs concurrently filed a Motion to Seal Documents filed in support of their

21   summary judgment motion. (ECF No. 273). Defendants did not timely oppose the Motion to Seal

22   and Plaintiffs filed a Notice of Non-Opposition on July 2, 2024. (ECF No. 280). Defendants

23   belatedly filed their Opposition to the Motion to Seal on July 19, 2025. (ECF No. 283). The

24   Opposition did not address the failure to file by the deadline of June 26, 2024. Id.

25

26   derivative shareholder claims, derived from Delaware law, is "looking at the body of the complaint and considering
     the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail
27   without showing an injury to the corporation?"); see also Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp.
     1385, 1399 (D. Del. 1984) (whether a claim is individual or derivative is determined from the body of the complaint,
28   not the label employed by counsel). The Court finds the harm alleged is a harm to the corporation and all its
     shareholders, rather than a harm unique to the plaintiff-shareholders here.

On June 25, 2024, the Court extended the deadline for dispositive motions to July 5, 2024, with responses due on July 19, 2024, and replies due on August 2, 2024. (ECF No. 276). On July 19, 2024, Defendants filed their Opposition to Plaintiffs' Motion for Partial Summary Judgment. (ECF No. 281).

On August 2, 2024, Plaintiffs replied in support of their Motion to Seal and Daubert Motions, noting Defendants' failure to timely oppose and arguing the Court should grant the Motions under this Court's Local Rules of Practice LR 7-2 and LR IA 6-1. (ECF Nos. 286-88, 290). Plaintiffs also replied in support of their Motion for Partial Summary Judgment and filed a Notice of Evidentiary Objections to the declaration of counsel for Defendants, Peter L. Chasey, which was submitted by Defendants in support of their Opposition to Plaintiffs' Motion for Partial Summary Judgment. (ECF Nos. 290-291).

On December 18, 2024, Plaintiffs filed a Notice of Decision and Order in the case <u>SEC v. Airborne Wireless Network, et. al</u>., S.D.N.Y. Case No. 1:21-cv-01722-CM ("the SEC Action"). (ECF No. 310). Plaintiffs attached the order of the S.D.N.Y Court granting in part the SEC's Motion for Entry of Final Judgment against defendants, some of whom are named Defendants in this case. <u>Id.</u> The Plaintiffs stated they would update the Court if a final judgment was entered in the SEC Action. <u>Id.</u> They did not do so.

On December 31, 2024, Defendants, excluding Defendant Daniels, filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. (ECF No. 308). Defendants' Motion argued that the equitable remedy of disgorgement which was awarded against the defendants in the SEC Action for the benefit of stockholder victims of the fraudulent scheme involving Airborne—which is also the subject of this action—would provide monetary remedies to the Plaintiffs for their damages in this private suit. (ECF No. 308). Defendants claimed that Plaintiffs' damages in this lawsuit are co-extensive with the monetary remedy they will obtain from the SEC Action, and thus they are entitled to offset or setoff under Nevada law to prevent Plaintiffs from obtaining a double recovery. <u>Id.</u>  Defendants argued that the offset of Plaintiffs' damages in the instant lawsuit render the amount in controversy less than $75,000 and therefore divest this Court of jurisdiction under 28 U.S.C. § 1332(a)(1). <u>Id.</u> The Motion to Dismiss was fully

briefed by January 26, 2025. (ECF Nos. 309, 311).

On February 21, 2025, the Court noted that a final judgment had been entered in the SEC Action on January 15, 2025, and provided the parties an opportunity to file supplemental briefing discussing the preclusive effect of the judgment in favor of the SEC on the instant matter. (ECF No. 317). The parties filed supplementary briefing. (ECF Nos. 318-19). Neither party argued the SEC Action had any *res judicata* effect on the instant lawsuit. Id.

On March 3, 2025, the Court held a hearing on the pending Motions and granted the Plaintiffs' (ECF No. 267) Motion for Leave to File, *nunc pro tunc*, and denied the Motion to Seal (ECF No. 273) as moot, because Plaintiffs had not submitted any documents under seal to the Court. (ECF No. 320). The Court also denied Defendants' Motion to Dismiss, explaining that the amount in controversy for purposes of diversity jurisdiction is determined at the time the Complaint is filed and is not affected by any potential offset of Plaintiffs' damages due to the recent final judgment in the SEC Action. Id. The Court heard arguments on the (ECF Nos. 268, 270) Daubert Motions and the (ECF No. 274) Motion for Partial Summary Judgment and took those Motions under advisement. Id. The Court's Order on those pending Motions follows.

At the March 3, 2025 hearing, Defendant Daniels' counsel informed the Court that Daniels had entered a plea agreement for conspiracy to commit securities fraud in connection with his role at Airborne. Daniels' counsel stated a change of plea hearing in Daniels' criminal proceeding was pending and that he was not taking any position on the instant Motion for Partial Summary Judgment in this case.

On March 5, 2025, Plaintiffs refiled a renewed Motion to Seal, stating that the documents intended to be filed under seal were inadvertently not submitted to the Court in their original Motion. (ECF No. 321). The Plaintiffs filed their unredacted exhibits in support of their Motion for Partial Summary Judgment under seal. (ECF Nos. 322-23). Defendants did not oppose the renewed Motion to Seal and Plaintiffs filed a Notice of Non-Opposition. (ECF No. 324).

///

///

///

1    **II.    LEGAL STANDARDS**

2    **A.    Motion to Seal**

3        A party may file a motion for leave to file documents under seal, and after notice to all

4 parties and an opportunity to be heard, the Court may direct the unsealing of those documents,

5 with or without redactions. LR IA 10-5. There is a federal common law right of the public "to

6 inspect and copy public records and documents" which extends to materials submitted in

7 connection with motions for summary judgment. Foltz v. State Farm Mut. Auto Ins. Co., 331 F.3d

8 1122, 1134 (9th Cir. 2003). The Ninth Circuit has a strong presumption in favor of access to Court

9 records. Id. at 1135. The common law right of access, however, is not absolute and can be

10 overridden by sufficiently "compelling reasons" for doing so. Id. In making the determination,

11 courts should consider all relevant factors, including: "the public interest in understanding the

12 judicial process and whether disclosure of the material could result in improper use of the material

13 for scandalous or libelous purposes or infringement upon trade." Hagestad v. Tragesser, 49 F.3d

14 1430, 1434 (9th Cir. 1995). After considering the relevant factors, the Court must base its decision

15 on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis

16 or conjecture. Id.

17    **B.    Motions to Exclude Expert Testimony**

18        Under the Federal Rules of Evidence 702 and Daubert, "a witness who is qualified as an

19 expert by knowledge, skill, experience, training, or education may testify in the form of an opinion

20 or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the

21 expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand

22 the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data;

23 (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion

24 reflects a reliable application of the principles and methods to the facts of the case." Daubert v.

25 Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) (establishing the standard codified in Rule

26 702).

27        "The district court judge must ensure that all admitted expert testimony is both relevant

28 and reliable." Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1232 (9th Cir. 2017). "The focus

1    of the district court's analysis must be solely on principles and methodology, not on the conclusions

2    that they generate," and the court's task "is to analyze not what the experts say, but what basis they

3    have for saying it." Id. (emphasis added). The district court may consider "whether the theory or

4    technique employed by the expert is generally accepted in the scientific community; whether it's

5    been subjected to peer review and publication; whether it can be and has been tested; and whether

6    the known or potential rate of error is acceptable." Id.; see also Grodzitsky v. Am. Honda Motor

7    Co., 957 F.3d 979, 984-85 (9th Cir. 2020).

8          "Challenges that go to the weight of the evidence are within the province of a fact finder,

9    not a trial court judge. A district court should not make credibility determinations that are reserved

10   for the jury." Elosu v. Middlefork Ranch Inc., 26 F.4th 1017, 1024 (9th Cir. 2022). The judge is

11   "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely

12   because they are impeachable." City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1044 (9th

13   Cir. 2014) (internal citation omitted).

14              **C.  Motion for Summary Judgment**

15         Summary judgment is appropriate when the pleadings, depositions, answers to

16   interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no

17   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

18   Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive

19   law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby,

20   477 U.S. 242, 248 (1986).

21         The moving party bears the burden of showing the absence of material disputes of fact.

22   Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to show specific facts

23   demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio

24   Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the court

25   views all facts and draws all inferences in the light most favorable to the nonmoving party.

26   Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

27         However, the nonmoving party may not merely rest on the allegations of his pleadings. He

28   must produce specific facts by affidavit or other evidence showing a genuine issue of fact.

- 6 -

1   Anderson, 477 U.S. at 256 (1986). In other words, the nonmoving party "must do more than simply

2   show that there is some metaphysical doubt as to the material facts . . . Where the record taken as

3   a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

4   issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation

5   marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility

6   determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th

7   Cir. 2017) (citations omitted).

8            The parties have the burden to support their motion and opposition with evidence and

9   specific references to the record that they wish the Court to consider. Fed. R. Civ. P. 56(c); Carmen

10  v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). It is not the Court's task

11  "to scour the record in search of a genuine issue of triable fact" rather, the Court relies on the

12  parties to "identify with reasonable particularity the evidence . . ." Keenan v. Allan, 91 F.3d 1275,

13  1279 (9th Cir. 1996); Schneider v. TRW, Inc., 938 F.2d 986, 990 n.2 (9th Cir. 1991) ("district

14  court is under no obligation to mine the full record for issues of triable fact").

15

16  **III.    EVIDENTIARY RULINGS**

17           As a preliminary matter, the Court first addresses Plaintiffs' objections to material evidence

18  produced by Defendants in opposition to summary judgment.

19           Plaintiffs raise a multitude of objections to the evidence submitted in support of

20  Defendants' Opposition. A "court can only consider admissible evidence in ruling on a motion for

21  summary judgment." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). Rule 56

22  requires the parties to set out facts they will be able to prove at trial. Id. While the evidence

23  presented at the summary judgment stage does not yet need to be in a form that would be

24  admissible at trial, the proponent must set out facts that it will be able to prove through admissible

25  evidence. See Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010) citing Fed. R. Civ.

26  P. 56(c)(4) ("A supporting or opposing affidavit must be made on personal knowledge, set out

27  facts that would be admissible in evidence, and show that the affiant is competent to testify on the

28  matters stated."). Before ruling on summary judgment, a district court must rule on evidentiary

1  objections that are material to its ruling. Id.

2      To the extent any of Plaintiffs' objections are not discussed in this Order, it is because the

3  Court did not rely on the objected-to evidence in reaching its ruling on summary judgment. Further,

4  the Court finds Plaintiffs raise "every objection imaginable without regard to whether the

5  objections are necessary or even useful." Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110,

6  1119 (E.D. Cal 2006). For example, Plaintiffs repeatedly raise generic objections without

7  describing the grounds for the objection specifically. To illustrate, relevance objections under

8  Federal Rules of Evidence 401-402 are lodged repeatedly, without explaining why the evidence at

9  issue is irrelevant. Such objections are misguided because they are duplicative of the summary

10  judgment standard itself. Id. The Court will not rely on irrelevant facts in determining whether

11  there is a *material* dispute for purposes of summary judgment.

12      Likewise, Plaintiffs object that statements in declarations should be excluded for

13  "prejudice, confusion, waste of time, or other reasons" under Rule 403, but there is no risk of

14  prejudice or confusion to the jury arising from the Court's consideration of objected-to evidence

15  at the summary judgment stage.

16      Therefore, the Court rejects Plaintiffs' generalized objections not addressed below as

17  without merit. The Court addresses Plaintiffs specific objections to material evidence in turn.

18      **A.    Personal Knowledge**

19      Plaintiffs object to the declarations of Defendants' counsel Peter L. Chasey, Defendant

20  Michael J. Warren, and Defendant Robert Bruce Harris in their entirety for lack of personal

21  knowledge. Fed. R. Evid. 602.

22      **1.  Chasey Declaration**

23      Counsel for Defendants, Mr. Chasey, provides a declaration attaching various exhibits,

24  including declarations of Defendants Warren and Harris and the reports of Defendants' expert

25  witnesses. Chasey attests the attached exhibits are "true and correct" but fails to establish how he

26  has personal knowledge of their authenticity. A declaration by counsel stating that a document is

27  "true and correct," without more, does not comply with the requirements of Rule 56. See e.g., Orr

28  v. Bank of Am., NT & SA, 285 F.3d 764, 774 (9th Cir. 2002); Beyene v. Coleman Sec. Services,

Inc., 854 F.2d 1179, 1182 (9th Cir. 1988). Rather, "to be considered by the court, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56 and the affiant must be a person through whom the exhibits could be admitted into evidence." Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1550–51 (9th Cir. 1990) (internal quotations and brackets omitted).

Therefore, the objection to Chasey's declaration is sustained and the Court finds Chasey's declaration is insufficient to authenticate the documents attached to the declaration.

### 2. Warren Declaration

Defendant Warren's declaration discusses the following material facts: his relationship with Defendants Daniels, M. De Mos, and Kabilafkas, their roles at Airborne, his interactions and personal relationship with them, their offering him the position of CEO of Airborne, Kabilafkas' offer to guarantee his employment salary, Kabilafkas' authority over Warren, his understanding of restrictions on Airborne shares Plaintiffs acquired, his interactions in 2017 with Plaintiff Valkanas regarding stock options and restricted Airborne shares, his roles and responsibilities as CEO, the positions and backgrounds of Airborne employees, the development of Airborne's intellectual property, transactions Airborne entered into with so-called "toxic lenders," and the decline of Airborne stock price to under a penny in August 2017.

While Warren never attests explicitly that his statements are based on his personal knowledge, the Court finds Warrens' personal knowledge and competence to testify as to the above matters can be inferred from the declaration itself, which describes his personal involvement in the matters discussed, and prefaces statements with "to my knowledge." Barthelemy v. Air Lines Pilots Ass'n, 897 F.3d 999, 1018 (9th Cir. 1990) ("Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred from a declaration itself."). Likewise, the Court finds Warren's personal knowledge of Airborne's operations, transactions, and financial position can be inferred from his position as CEO of Airborne. In re Kaypro, 218 F.3d 1070, 1075 (9th Cir. 2000) (personal knowledge can be inferred from a declarant's position within a company) (citing Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 206 F.3d 1322, 1330 (9th Cir. 2000)).

1    For the foregoing reasons the objection to Warren's declaration is rejected.

2    **3. Harris Declaration**

3    Defendant Harris' declaration discusses the following material facts: Warren's background

4    and employment history, his relationship to Defendant Kabilafkas, his becoming a controlling

5    shareholder of Apcentive through Kabilafkas, his appointment as president of Apcentive,

6    Apcentive's patent purchase in 2015 through a referral by Defendants Kabilafkas and Marius De

7    Mos ("M. De Mos"), his control over Apcentive's bank account, contracts, and shares, his

8    relationship to Defendant Daniels and Ample-Tee, through Defendant Kabilafkas, the July 16,

9    2015, Apcentive intellectual property purchase from Ample Tee (which changed its name to

10   Airborne) in exchange for Airborne shares, his instruction as Apcentive president to the company's

11   transfer agent to distribute Airborne shares to Apcentive shareholders after the stock conversion,

12   and his lack of involvement with Airborne after the conversion of Apcentive shares, when

13   Apcentive ceased operating.

14   As with Warren's declaration, while Harris never specifically attests his statements are

15   based on personal knowledge, the Court finds Harris' personal knowledge and competence to

16   testify as to the above matters can be inferred from the declaration itself, which describes his

17   personal experience and involvement, and from his position as president and director of Apcentive.

18   Id.

19   For the foregoing reasons the objection to Harris' declaration is rejected.

20   **B.  Unsworn Expert Reports**

21   Plaintiffs object to the expert witness reports of Musey and Emanuele because they are not

22   sworn to by the experts under penalty of perjury, nor accompanied by a declaration or affidavit in

23   accordance with the requirements of Rule 56(c)(4).

24   On summary judgment, an expert opinion is admissible to create a triable issue of fact if it

25   is sworn to by the expert or accompanied by a declaration of the expert attesting to the accuracy

26   of the report, the expert's competence to testify consistent with the opinions and conclusions of

27   the report, and the expert's factual basis for said opinions. Am. Fed'n of Musicians of United States

28   & Canada v. Paramount Pictures Corp., 903 F.3d 968, 977 (9th Cir. 2018); Bulthuis v. Rexall

1    Corp. 789 F3d 1315, 1318 (9th Cir. 1985).

2          The Court finds that because Musey and Emanuele have not sworn under penalty of perjury

3    as to the accuracy of their findings, the factual bases for those findings, and their competence to

4    testify consistent with the findings, the Court cannot consider their reports on summary judgment.

5          Even if the expert reports were properly sworn, Defendants' references to them in their

6    Opposition are deficient. Defendants only cite to one specific page of Musey's expert report,

7    wherein Musey opines that Defendant Airborne's internal $0 patent valuation is misleading

8    because it could have *some* potential value. (ECF No. 281). Defendants only other reference to the

9    expert reports refers the Court to "the reports of Defendants' retained expert witnesses for a more

10   grounded understanding of the circumstances before this Court." Id. Because parties must

11   designate specific facts and their location in the record when relying on witness testimony to

12   establish a dispute of fact, this defect alone warrants the exclusion of the expert reports on

13   summary judgment, other than the single specific citation to Musey's opinion on patent evaluation.

14   See Orr, 285 F.3d at 775 (holding the failure of a party to submit evidence responsibly by failing

15   to cite to page numbers warrants exclusion of the deficiently referenced evidence at the summary

16   judgment stage).

17         For the foregoing reasons, Plaintiffs' objections to Defendants' expert witness reports are

18   sustained. The Court will not consider the contents of the reports in reaching its ruling on summary

19   judgment.

20

21   **IV.    FACTUAL BACKGROUND**

22         Before discussing its factual findings, the Court addresses Plaintiffs' reliance on evidence

23   on record before the court in SEC v. Airborne Wireless Network, *et. al.*, S.D.N.Y. Case No. 1:21-

24   cv-01722-CM ("the SEC Action"), but not before this Court, and Plaintiffs' citations to their expert

25   witness opinions as undisputed facts.

26         Plaintiffs' statement of undisputed material facts repeatedly cites the opinions of their

27   expert witnesses, which appear to be based on extensive evidence from the SEC Action that has

28   not been filed in this case. The Court's factual findings in this case are limited to the record before

1    it, as directly and specifically cited by Plaintiffs in their moving papers. To the extent Plaintiffs'

2    cited experts' opinions are based upon and cite to evidence not attached to Plaintiffs' briefing,

3    those citations do not meet the requirements of Rule 56. See Fed. R. Civ. P. 56(c)(a) (a party

4    asserting that a fact cannot be genuinely disputed must support the assertion by citing to "particular

5    parts of materials *in the record*") (emphasis added).

6    　　　　Moreover, Plaintiffs' claim that Defendants' failure to produce sworn expert reports render

7    Plaintiffs' expert opinions undisputed facts is unavailing. Expert opinions are just that—

8    opinions—and it is for the fact finder, not the Court, to determine how much weight to give such

9    opinions. Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

10   　　　　Finally, Plaintiffs' inclusion of the S.D.N.Y court's decision on summary judgment in the

11   SEC Action does not render that court's factual findings binding against the Defendants here. To

12   rule otherwise would be to apply issue preclusion against Defendants, which Plaintiffs specifically

13   argue against. See ECF No. 319 (arguing against issue preclusion and claiming there is no

14   substantial overlap between the evidence or argument advanced in this proceeding and that

15   advanced in the SEC Action).

16   　　　　**A. Undisputed Facts**

17   　　　　The Court finds the following facts to be undisputed.

18   　　　　　　**i.  *Acquisition of Airborne, Formerly Ample-Tee, by Defendants Kabilafkas and***

19   ***Daniels***

20   　　　　Defendant Airborne is a public Nevada corporation originally known as Ample-Tee, Inc.

21   Columbia Stock Transfer Company (CSTC) was its transfer agent. In 2014, CSTC through its

22   agent Michelle White, entered into a "Transfer Agent and Registrar Agreement" with Ample-Tee,

23   which was executed by someone represented as Ample-Tee's president, Lawrence Chenard. Ms.

24   White communicated with Ample-Tee through a man named Marc Crimini who she understood to

25   be working as a consultant for Ample-Tee. In approximately 2013, Mr. Cremini asked CTSC to

26   prepare stock certificates for persons represented as-then shareholders of Ample-Tee. In January

27   2014, CTSC received a list from Mr. Chenard identifying himself as an Ample-Tee shareholder

28   along with thirty other persons with addresses in Thailand.

1        In January 2016, Ms. White was informed in an email by counsel for Ample-Tee, cc'ing

2    Defendant Daniels, that the company was sold, and on October 20, 2015, there was a change in

3    control from Lawrence Chenard to Defendant J Edward Daniels. Subsequently, persons who had

4    acquired share certificates from the former Thai shareholders presented their certificates to CSTC

5    to be issued in their names. One such individual was Defendant Kabilafkas.

6        Sometime after the sale, Ample-Tee's name was changed to Airborne.

7        M. De Mos described Ample-Tee as a public shell that was purchased by Defendant

8    Daniels, at Defendant Kabilafkas' suggestion, to raise money for the development of a wireless

9    network project.

10         **ii.  *Ownership and Control of Apcentive***

11       Apcentive is a Nevada corporation that promoted itself as seeking to develop a fully

12   meshed network of aircraft and mini satellites that would become "the first and only true airborne

13   digital superhighway in the sky."

14       According to his deposition testimony, Defendant Harris was the president and sole officer

15   of Apcentive from approximately 2011 to approximately July or August of 2016, the date

16   Apcentive ceased operating. Harris testified that he was named as Apcentive president because

17   Kabilafkas wanted him to buy the company as a shell, and Harris knew how to file corporate

18   documents. Harris described Kabilafkas and Daniels as creating the business model for Apcentive,

19   which they designed as a dormant public shell formed to find potential projects for Kabilafkas and

20   Daniels to secure uncontrolled, retired, or dormant patents. According to Harris, Kabilafkas was

21   "the interconnection between Apcentive, Daniels, and the potential investors."

22       While Harris was President of Apcentive, he was working full-time at a car dealership. He

23   described his role as capital raising and documenting things for Apcentive, and his sole job duty

24   as preparing corporate paperwork, government filings, and issuing stock certificates.

25       In their Opposition, Defendants submit a declaration by Harris. Some of Harris' statements

26   clearly and unambiguously contradict his previous deposition testimony. For the first time in his

27   declaration, Harris states that he was not involved in business with Kabilafkas until 2014, despite

28   previously testifying in a deposition that he became president of Apcentive under the direction of

1    Kabilafkas in 2011. The Court finds these contradictory statements are "sham." Van Asdale v.

2    International Game Tech, 577 F.3d 989, 998 (2009). Because there has been no showing that

3    Harris' prior damaging testimony resulted from mistake or confusion, the Court disregards these

4    statements as creating no *genuine* issue of fact. Id. ("[I]f a party who has been examined at length

5    on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own

6    prior testimony, this would greatly diminish the utility of summary judgment as a procedure for

7    screening out sham issues of fact.") (citations omitted).

8    Despite Harris' role as sole officer and president of Apcentive, M. De Mos was represented

9    as Apcentive's CEO in the company's marketing materials, which made no mention of Harris.

10   Harris testified these materials were prepared to raise capital from private investors.

### iii.  *Apcentive Consulting Agreement with Plaintiff Valkanas*

12   On or around August 31, 2015, Plaintiff Valkanas received a consulting agreement signed

13   by Defendant Harris which he executed and returned. Per the agreement, Valkanas, on behalf of

14   KEET Trust, was to render "strategic advisory services" to Apcentive, including to refer private

15   shareholders to Apcentive. In performance of the agreement, Valkanas introduced all Plaintiffs

16   and other investors to Apcentive. Valkanas communicated with Kabilafkas regarding questions

17   about Apcentive. Valkanas understood Kabilafkas to be a significant Apcentive investor.

18   Defendant Daniels had knowledge of the consulting agreement.

19   Valkanas received the full cash component of what he was entitled to under the agreement.

20   He was also entitled to receive Apcentive stock options. The agreement's terms provided that each

21   time an accredited investor referred by Valkanas bought shares in Apcentive, Valkanas received

22   an option that would vest immediately at closing of each transaction to purchase Apcentive shares

23   at the $0.50 referral price. The agreement provided a three-year expiration date for exercising the

24   options.

25   In February 2017, near the end of the agreement term, Valkanas asked Kabilafkas for a

26   letter confirming the number of stock options he was to receive pursuant to the agreement. At that

27   time Kabilafkas informed Valkanas that Airborne would not honor the consulting agreement.

28   According to Valkanas, this was the first time he learned about the July 21, 2016 Airborne purchase

of Apcentive intellectual property for consideration of 40 million shares of Airborne at $0.001 par value common stock. Soon after, on a call with Kabilafkas, Kabilafkas suggested there was an opportunity to purchase Airborne shares from a separate company. Valkanas emailed Kabilafkas and Harris several times to follow up on purchasing the Airborne shares as payment of the option component of the consulting agreement.

Valkanas and Kabilafkas discussed that Valkanas would receive 1.45 million Airborne shares through a different entity. On August 25, 2017, Kabilafkas, through his attorney, sent Valkanas a draft stock purchase agreement reflecting the 1.45 million shares. In subsequent negotiations, the parties could not agree that the deadline of Valkanas to pay the full purchase price of 1.45 million shares for $0.50 per share be no later than December 5, 2017.

After November 6, 2017, Kabilafkas stopped returning Valkanas' or his counsels' calls and the agreement was never executed. Valkanas did not receive the options he was entitled to under the consulting agreement with Apcentive.

### iv. *Plaintiffs Invest in Apcentive*

After August 2015, Plaintiffs became shareholders in Apcentive through the private placement coordinated by Plaintiff Valkanas, wherein shares were offered at $0.50. According to Harris, investors in Apcentive attested to a net worth of at least $1,000,000, acknowledged the high risk of their investment, and acknowledged they were purchasing unregistered and restricted shares which could possibly never be sold.[3]

### v. *Defendant Kabilafkas' Control of Apcentive*

Various email communications between Defendant Kabilafkas and Harris indicate Kabilafkas was controlling Apcentive payments to individuals and entities, knew the balance of Apcentive's bank accounts, and was directing the terms of employment for a consulting CEO for Apcentive named Brian Cafferty. Harris' deposition testimony confirms Kabilafkas' controlled

---

[3] In their Reply in support of summary judgment, Plaintiffs object to this aspect of Harris declaration under Federal Rule of Evidence 1002, arguing it describes and seeks to prove the contents of a Subscription Agreement Plaintiffs entered into when investing in Apcentive, and noting said agreement has not been produced. The Court overrules this objection to the extent that Harris testifies as to what Plaintiffs agreed to when they invested in Apcentive through private placement, without referring to a Subscription Agreement explicitly. As detailed above, the Court finds Harris' personal knowledge regarding such agreements can be inferred from Harris' role as president of Apcentive. Further, the Court finds this fact is undisputed because Plaintiffs produce no evidence contradicting it.

1    Cafferty's terms of employment.

2    In August 2015, Kabilafkas also sent Harris Ample-Tee certificates from Thai shareholders

3    to Harris for his "due diligence."

4    Harris was designated as the sole owner and signer of Apcentive's operating and savings

5    accounts. From 2016-2017, handwritten checks from Apcentive's operating account were issued

6    to Kabilafkas' personal checking account, to Kabilafkas' father, and to Kabilafkas' associate

7    Dimitros Foussekis. Also, a cash withdrawal was made from Apcentive's operating account and

8    deposited in Kabilafkas' account on the same day, and a wire transfer from Apcentive's operating

9    account to Kabilafkas' personal checking account was made. The amount of these payments

10   totaled $113,250. According to Harris, he had sole control of Apcentive's bank account but

11   oftentimes made payments with the assistance of Kabilafkas.

12       **vi.   *Airborne's Purchase of Apcentive's Intellectual Property***

13   On July 31, 2016, Defendant Daniels, as president of Airborne, and Defendant Harris, as

14   president of Apcentive, entered into an Intellectual Property ("IP") Purchase Agreement, wherein

15   Airborne purchased Apcentive's U.S. Patent Number 6285878 and the trademark "Infinitus Super

16   Highway." Daniels was in receipt of a draft report from DS Enterprises, Inc. on October 20, 2015,

17   which found the IP value was reasonably represented as zero. The report also indicated the patent

18   would expire in less than five years, had multiple previous owners who had been unable to

19   commercialize the Patent, and based on projections that approximately $582.8 million in capital

20   would be required to bring Airborne's product to market, rendered "the ability to raise that type of

21   capital prior to the patent expiring seems unlikely." According to M. De Mos, the total capital

22   required to bring Airborne to market would have been "about $6 billion to get to a Google-sized

23   network."

24   On February 12, 2017, Defendant Jason De Mos, Vice President of Business Development

25   and Aviation Compliance at Airborne beginning in October 2016, provided the actor Ashton

26   Kutcher Airborne marketing material which stated "Apcentives' assets were purchased by a public

27   company this past August trading under Airborne" and attempted to solicit an investment from

28   Kutcher.

The DS Enterprises report findings were not disclosed until April 9, 2018, in an Airborne Form 10-Q. The report stated the IP "was recorded on the Company's books at its historical cost of $0," that its "future net economic benefit could not be reasonably estimated," and that the patent would expire in less than three years.

### vii.    *Apcentive Shares are Converted to Airborne Shares*

On or around July 6, 2017, Plaintiffs were informed by Defendant Harris via letter that their private shares in Apcentive would be exchanged for publicly traded shares of Airborne at a rate of 1.14 shares of Airborne for every 1 share of Apcentive. On or around July 19, 2017, CSTC issued 40,000,000 restricted Airborne shares from Apcentive stock certificates to numerous individuals and entities including Plaintiffs. Plaintiffs, including ten Plaintiffs who have been dismissed, were issued a total of 1,298,496 shares, all of which were restricted. The restriction was for 24 months after the date the shareholder received their share certificate.

### viii.    *Airborne Revere Stock Split*

On or around August 27, 2018, Airborne caused a reverse stock split of 1:30,000. As a result, as of August 31, 2018, Plaintiffs each had one restricted Airborne share. Around this time the share value fell to less than a penny.

### ix.    *Airborne Directors and Officers*

Defendant Jason De Mos was the Vice President of Business Development and Aviation Compliance at Airborne beginning October 2016.

Defendant Daniels was Airborne's President, Treasurer, Secretary and Director, and served in that capacity since October 20, 2015, though his employment was formalized on July 31, 2018.

On February 1, 2017, Defendant Warren entered into an employment agreement with Airborne to serve as the company's CEO. He had never previously been a director of a public company.

Defendant Harris was not an officer or director of Airborne, and testified he did not want to be involved in operating another public company because of his full-time employment at a car dealership.

Kabilafkas was a shareholder, but not an officer, of Airborne. M. De Mos testified that

1    when Apcentive became Airborne, he "took a backseat to everything and anything" and "was being

2    very quiet as far as what his activities were."

3            **x.   *Kabilafkas' Communications with Warren***

4            In an August 3, 2016 email exchange between Defendant Kabilafkas and Warren,

5    Kabilafkas discussed the terms of Warren's employment and Warren asked to "personally and

6    privately" speak with Kabilafkas before moving forward. Kabilafkas offered to act as a "personal

7    guarantor" of Warren's salary until Warren "and the rest of the company's team get the company

8    off the ground." In his declaration, Warren states he thought Kabilafkas was joking.

9            On August 6, 2016, Kabilafkas sent Warren sample contracts and suggested the two have

10   a video call, ending his note with "going to be a good action filled week for Airborne."

11           In September 2016, Kabilafkas informed Warren of his duties at Airborne, writing that his

12   "major attention should be on [Defendant Daniels'] stuff" as Warren's duty would be "oversight

13   of ALL Departments and then the financial/legal compliant reporting of such."

14           **xi.   *Defendant Warren's Actions as Airborne CEO***

15           Defendant Warren signed and certified Airborne's SEC filings, wherein he vouched for the

16   accuracy and reliability of Airborne's disclosures including disclosure controls and procedures,

17   and internal controls over financial reporting.

18           When asked why authorizing the board of Airborne to effect up to five reverse stock splits

19   of the common stock of the company would be a measure to save the company, Warren was unable

20   to answer.

21           **xii.   *Kabilafkas Sells Airborne Shares***

22           Between January 19, 2017, and January 8, 2018, Kabilafkas sold 1,121,398 shares of

23   Airborne stock through his Glendale brokerage account and made a substantial profit. During this

24   period, Plaintiffs' shares remained restricted.

25           **xiii.   *Plaintiffs Were Unaware of Material Facts***

26           Plaintiffs attest they were neither aware nor informed by the Defendants in this lawsuit that

27   Harris worked full time at a car dealership while he was president, that Kabilafkas was directing

28   Harris, that Kabilafkas had control over Apcentive or Airborne, that Kabilafkas had prior history

1   and relationships with Warren and Daniels, that there was a relationship between Apcentive and

2   Airborne prior to the IP transaction wherein Kabilafkas had control over both companies, and that

3   Apcentive's IP value had been inflated. Plaintiffs attest that had they known this information prior

4   to their investment in Apcentive, they would have acted differently, and specifically, they would

5   not have become shareholders in Apcentive.

6           **xiv.  *Apcentive's Financial Projections***

7           Plaintiffs' damages calculations are based on Defendant Airborne's financial projections

8   in Apcentive's July 2015 business plan. That plan included a description of risks and uncertainties

9   that could result in expectations not being realized, including an inability to achieve a $500 million

10  capital infusion in year 3.

11          **B.  Disputed Facts**

12          The parties dispute the calculation of damages.

13          Plaintiffs' expert witness Jason Engel, retained to calculate Plaintiffs' economic damages,

14  "relied upon [his] direct experience and knowledge of the principles and guidelines of benefit-of-

15  the-bargain damages and consequential damages" to calculate Plaintiffs damages in this case.

16  According to Plaintiffs' damages expert, Defendants induced Plaintiffs to invest in Apcentive with

17  financial projections for the years 2016 to 2020, prepared in the above-described July 2015

18  business plan, projecting a value of shareholder equity of $2,950,641,813 by 2020. Apcentive's

19  November 2015 subscription agreement indicated that Apcentive authorized 200 million shares.

20  The expert could not determine from projections how many shares would have been issued as of

21  2020. The expert determined based on a "conservative assumption that all 200 million authorized

22  shares of Airborne would have been issued and outstanding by 2020," Apcentive's share value

23  would have been $14.75 as of 2020. Based on that calculation, the expert calculated Plaintiffs

24  economic "benefit of the bargain damages" based on this projected value. According to those

25  calculations, Plaintiffs are entitled to $18,199,566 in benefit-of-the-bargain damages.

26          Plaintiffs' damages expert also calculated out-of-pocket losses that Plaintiffs purportedly

27  suffered when they purchased Airborne shares in the open market, allegedly in an effort to dollar-

28  average the cost basis of their restricted shares and reduce their losses associated with the drop in

1    price in the open market of the Airborne shares. Plaintiffs purchased Airborne shares for a

2    collective price of $97,787.

3          Using the same financial projection-based calculation, Plaintiffs expert calculated

4    Valkanas was entitled to 1.45 million Airborne shares at an exercise price of $.50, for a total

5    benefit-of-the-bargain value of $20,667,153.

6          Defendants point out Plaintiffs' expert's conclusions as to causation and damages are based

7    on assumptions and inferences by Plaintiffs experts that are disputed and should be resolved by a

8    jury. Defendants argue that Plaintiffs would solely be entitled to out-of-pocket losses in connection

9    with their investment in Apcentive, rather than benefit-of-the-bargain damages. Defendants

10   calculate the number of shares Plaintiffs purchased in Apcentive through private placement using

11   Plaintiffs' own calculations, stating the number of Apcentive shares purchased can be calculated

12   by dividing the total number of converted Airborne shares by the conversion ratio of 1.14 for an

13   amount of $560,615.50 spent on approximately 1,139,021 unregistered and restricted Apcentive

14   shares, purchased at $0.50 per share through private placement.

15

16   **V.    DISCUSSION**

17         Before considering Plaintiffs' Motion for Partial Summary Judgment on the merits, the

18   Court briefly addresses Plaintiffs' Motion to Seal and Daubert Motions.

19         **A.  Motion to Seal**

20         Plaintiffs seek to file their brokerage statements under seal. Because these documents are

21   filed in support of a dispositive motion for summary judgment, Plaintiffs must establish the high

22   threshold of "compelling reasons" for maintaining the secrecy of the brokerage statements.

23   Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1180 (9th Cir. 2006). This high threshold

24   is due to the strong presumption of public access to judicial records where the records to be sealed

25   are material to the resolution of a legal dispute on the merits. Id. at 1180. Under the "compelling

26   reasons" standard, Plaintiffs must present "articulable facts identifying the interest favoring

27   secrecy" Foltz v. State Farm Mutual Auto. Insurance Co., 331 F.3d 1122, 1135 (9th Cir. 2003).

28   Further, Plaintiffs must show how these specific interests outweigh "the public interest in

1    understanding the judicial process." <u>Hagestad v. Tragesser</u>, 49 F.3d 1430, 1434 (9th Cir. 1995).

2        In general, "compelling reasons" sufficient to outweigh the public interest in disclosure

3    and justify sealing court records exist when "court files might have become a vehicle for improper

4    purposes such as the use of records to gratify private spite, promote public scandal, circulate

5    libelous statements, or release trade secrets." <u>Kamakana</u>, 447 F.3d at 1179. The fact that the records

6    may lead to a litigants' embarrassment, incrimination, or exposure to further litigation will not,

7    without more, compel the Court to seal its records. <u>Id.</u>

8        Plaintiffs compelling reason for sealing their brokerage statements is that the documents

9    are confidential personal financial documents. Plaintiffs further argue their sole relevance is in

10   corroborating their claim for out-of-pocket damages by reference to their purchases of Airborne

11   stock, and their unrelated financial information is irrelevant to the merits of this case.

12       An individual's privacy interest in keeping personal financial account information

13   confidential has been recognized by district courts in the Ninth Circuit as sufficiently compelling.

14   <u>See e.g.</u>, <u>Lin v. Suavei, Inc.</u>, No. 3:20-CV-0862-L-AHG, 2023 WL 7501403 (S.D. Cal. Nov. 13,

15   2023) (collecting cases). The Court finds Plaintiffs privacy interest in keeping personal financial

16   information in their brokerage account statements confidential is sufficiently compelling to

17   outweigh the presumption of the public right to access court records, <u>but only as to the financial</u>

18   <u>information that is not relevant to this litigation</u>. Plaintiffs cannot claim a privacy interest in the

19   information relating to their purchase and sale of Airborne stock, because that information is

20   directly relevant to their claimed damages and has already been disclosed in the public record in

21   Plaintiffs' expert report. Therefore, Plaintiffs have waived their right to privacy as to that financial

22   information. Accordingly, the Court will order the unsealing of the papers filed under seal with

23   redactions of the personal financial information that is not relevant to Plaintiffs' damages.

24       Plaintiffs' argument that the Court should grant Plaintiffs' Motion because Defendants

25   failed to oppose the Motion and thereby consented to it being granted under Local Rule IA 7-2(d)

26   is unavailing in this context, where the Court must weigh the public's interest, not just the private

27   interests of the parties. <u>See</u> <u>Nixon v. Warner Commc'ns, Inc.</u>, 434 U.S. 589 (1978).

28       ///

**B.  Plaintiffs' Motions to Exclude Defendants' Expert Witness Testimony**

Plaintiffs move to exclude the report and testimony of Defendants' expert witness Musey and rebuttal expert witness Emanuele under Daubert.

As an initial matter, the Court declines to grant Plaintiffs' Motions to Exclude solely based on Defendants failure to timely file its oppositions, demonstrate excusable neglect, or address the arguments in Plaintiffs' Motions. While Defendants failure may constitute consent to the granting of the Motions under Local Rule 7-2, the Court nevertheless resolves the Daubert Motions on the merits, considering the policy in this circuit that cases be decided upon their merits whenever reasonably possible. Pena v. Seguros La Comercial, S.A., 770 F.2d 811, 814 (9th Cir. 1985). However, the Court considers Plaintiffs' Daubert Motions without considering Defendants' Oppositions, which, in any case, do not address any of Plaintiffs' legal arguments.

At this stage, the Court limits its determination on the admissibility of Defendants' expert testimony to whether both experts are qualified and have used accepted methodologies in coming to their conclusions under Daubert and Rule 702.  To the extent Plaintiffs raise specific objections as to the scope of the expert's testimony, based on, for example, the fact that aspects of the expert's testimony amount to legal conclusions that "usurp the jury's fact-finding function," the Court finds such objections are more appropriately resolved on motions *in limine* in advance of trial on the issues that survive the instant summary judgment Motion. Jun Yu v. Idaho State Univ., 15 F.4th 1236, 1246 (9th Cir. 2021).

**1. Musey Report**

Musey's report describes his qualifications as founder of Summit Ridge Group, LLC a provider of business valuation and financial consulting services in the telecommunications, media, and satellite industries. His skills include financial, market, and business strategy analysis. He has experience in research and investments in the mobile wireless tower industry, has published numerous academic and periodical publications, and has served as an expert witness in other complex securities litigations involving public companies. He holds a B.A. from the University of Chicago, and M.B.A. and J.D. from Northwestern University, and an M.A. from Columbia University.

1    Having considered Plaintiffs' objections to the report of Musey, the Court finds Musey is

2   qualified to testify as to the general state of the broadband industry during the time period relevant

3   to this lawsuit, between 2015 and 2020, the success rate of startup companies in the industry,

4   publications on valuation theory which discuss the typical information that investors are primarily

5   concerned with, and explanations for Airborne's share price decline such as Airborne's issuance

6   of "toxic financing." Musey is qualified to testify as to his opinions regarding financial markets

7   and business strategy based on his education and experience specifically within start up and

8   telecommunications industries within which Airborne and Apcentive were operating.

9    Plaintiffs' objection that Musey fails to identify specific "scientific" methodologies elides

10   the fact that expert testimony can be admissible even if based solely on experience. Musey's

11   expertise on business valuation and strategy is sufficient to render his opinions on general market

12   trends and the potential role of toxic financing in Airborne's stock price decline reliable, and thus

13   admissible. United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000) ("The Daubert factors

14   (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of

15   testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather

16   than the methodology or theory behind it.").

17    The Court finds Plaintiffs objections as to Musey's failure to review certain evidence that

18   Plaintiffs deem critical goes to the weight and credibility of Musey's analysis, not to its

19   admissibility. Plaintiffs' challenges demonstrate some of Musey's conclusions may be "shaky but

20   admissible evidence" that "is to be attacked by cross examination, contrary evidence, and attention

21   to the burden of proof, not exclusion." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596

22   (1993). Indeed, Plaintiffs' experts' conclusions are the kind of "contrary evidence" that can

23   properly be evaluated by the fact finder in determining the weight of Musey's testimony.

24    Again, to the extent Musey seeks to testify on ultimate issues of law, exclusion of his

25   testimony on that basis can be resolved in motions *in limine*, at which point Musey's testimony

26   will be limited to opinions relevant to the remaining triable issues of fact.

27    For the foregoing reasons the Court denies Plaintiffs' Motion to Exclude the testimony of

28   Musey under Daubert.

1              **2.  Emanuele Report**

2              As with Musey, the Court finds Plaintiffs' objections to the expert report of Emanuele go

3      to the weight and credibility of the evidence and do not warrant exclusion under <u>Daubert</u>.

4              Defendants retained Emanuele to provide a rebuttal to Plaintiffs' expert Engel's report or

5      testimony regarding Plaintiffs economic damages. Emanuele is a Certified Public Accountant and

6      Director of the Litigation Services Department at Gursey I Scheider. He has provided tax, audit,

7      and business valuation services to closely held companies, and forensic accounting services to

8      publicly traded corporations. He is a Chartered Financial Analyst (CFA), Accredit Senior

9      Appraiser (ASA), and Certified Fraud Examiner (CFE).

10             Plaintiffs first challenge Emanuele's reliance on the "Stout Study" as the source for a 30%

11     discount in value for lack of marketability attributed to restricted shares versus unrestricted shares.

12     Emanuele utilizes this 30% discount to show how Plaintiffs' expert Engel fails to account for the

13     fact that Plaintiffs shares in Apcentive were restricted and thus would have less value than freely

14     traded shares on the open market. Emanuele testified he utilized a 30% discount as a conservative

15     estimate, based on an average 33% discount found in the Stout Study which analyzed the difference

16     in value between restricted and freely traded stocks for publicly traded companies between 1966

17     and 1988. Plaintiffs contend Emanuele's use of the Stout Study should be excluded because he did

18     not make the calculation of what discount to apply by using Airborne's publicly available numbers

19     and inputting those numbers into the Stout database. The Court finds these deficiencies are best

20     explored through cross examination. <u>See</u> <u>In re REMEC Inc. Sec. Litig.</u>, 702 F. Supp. 2d 1202,

21     1218 (S.D. Cal. 2010). Emanuele explains the nature of the Stout Study and the reliance upon it

22     by experts in his field. Because Emanuele "explains the steps of his analysis and justifies the

23     numbers he used . . . his expert opinion is admissible." <u>Id</u>. at. 1219.

24             The Court finds the remaining conclusions of Emanuele's report are admissible under

25     <u>Daubert</u>. The report largely consists of identified flaws in Engel's analysis, which is proper rebuttal

26     testimony. <u>See</u> <u>In Re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod.</u>

27     <u>Liab. Litig.</u>, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) ("As a rebuttal witness, he may rely

28     largely on other expert reports, as he does, and point out flaws in their methodologies or

conclusions.")

Emanuele's rebuttal opinion points out that Engel's reliance on Apcentive's projected financial value for the year 2020 is not a reliable method for determining Plaintiffs' damages because both Apcentive and Airborne never came close to achieving the forecasted results. Emanuele further points out that Apcentive's projected value in 2020 has no bearing on the value per share of the Airborne stock during the period Plaintiffs claim their damages occurred. Emanuele suggests a more appropriate measure of share value would be the average of Airborne shares from the time Plaintiffs were notified their Apcentive shares were converted to Airborne shares, July 2017, to immediately before the Airborne common stock dropped below $1.00 per share in April 2018. During that period Emanuele points out the average price was $1.70 per share. Contrary to Plaintiffs' arguments, Emanuele's choice of this period is not arbitrary, and he provides a clear basis for the choice. Plaintiffs can challenge this choice through cross-examination. Further, although Emanuele does not account for Plaintiffs "benefit-of-the-bargain" theory, the Court finds Emanuele's proposed calculation is probative of the speculative nature of Engel's methodology and therefore a relevant and admissible rebuttable opinion.

Emanuele also challenges Engel's use of the highest share price of Airborne stock as the appropriate value for Plaintiffs damages due to the stock restrictions, pointing out that it cannot be assumed that Plaintiffs would have sold at the highest closing price during the relevant period. Emanuele also challenges the notion that Plaintiffs trading of Airborne stock on the open market can be attributed to the actions of Defendants because they reflect typical decisions investors make in hopes of profiting on rising stock prices. The Court finds these are appropriate rebuttal opinions on the potentially flawed assumptions underlying Engel's calculations, which Emanuele is qualified to make based on his expertise in the field of valuation.

Finally, Emanuele challenges the valuation of Valkanas' stock options due to the lack of evidence that Valkanas, through KEET Trust, had the means to purchase the 1.45 million Airborne shares before Airborne became worthless. Again, this is an appropriate point challenging the speculative nature of Engel's calculation of damages.

Plaintiffs' challenge that Emanuele does not adequately consider Plaintiffs' theory of

1  damages for failure to deliver securities as arising under a standard provided by Delaware law[4] is

2  unavailing because Engel does not identify that standard in his own report, and that standard is a

3  legal one, which is not the appropriate province of an expert witness. See Aquilar v. Int'l

4  Longshoremen's Union Local No. 10, 966 F.2d 443, 447 (9th Cir. 1992) (matters of law are

5  generally "inappropriate subjects for expert testimony").

6      For the foregoing reasons the Court denies Plaintiffs' Motion to Exclude the testimony of

7  Emanuele under Daubert.

8      **C.  Plaintiffs Motion for Partial Summary Judgment**

9      Plaintiffs move for Partial Summary Judgment on the following Nevada common law

10  claims: (1) Plaintiffs' first claim fraudulent concealment against Defendants Airborne, Apcentive,

11  Harris, and Daniels; (2) Plaintiffs' second claim breach of fiduciary duty against Defendants

12  Warren, Daniels, and Jason De Mos; (3) Plaintiff's third claim for aiding and abetting breach of

13  fiduciary duty against Defendants Harris and Kabilafkas; (4) Plaintiff Valkanas' (as trustee for the

14  KEET Trust) sixth claim for intentional interference with contractual relations against Defendants

15  Daniels, Harris, and Kabilafkas; and (5) Plaintiff Valkanas' seventh claim for breach of contract

16  against Defendant Apcentive.

17      ***i.  Claim One: Fraudulent Concealment Against Harris, Daniels, Apcentive, and
       Airborne***

18

19      To prevail on a cause of action for fraud based on a fraudulent concealment theory, a

20  plaintiff must show: (1) The defendant must have concealed or suppressed a material fact; (2) The

21  defendant must have been under a duty to disclose the fact to the plaintiff; (3) The defendant must

22  have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, that is,

23  he must have concealed or suppressed the fact for the purpose of inducing the plaintiff to act

24  differently than he would if he knew the fact; (4) The plaintiff must have been unaware of the fact

25  and would not have acted as he did if he had known of the concealed or suppressed fact; (5) And,

26

---

27  [4] Plaintiffs cite Haft v. Dart Group Corp., 877 F. Supp. 896, 902 (D. Del. 1995). They argue that case, which
   provides "damages for a failure to deliver securities are generally determined by the highest market price the stock
28  reached within a reasonable time of plaintiff's discovery of the breach," is the appropriate standard for determining
   Plaintiffs economic damages due to the stock restrictions. The Court notes that case is not particularly on point for
   Plaintiffs' damages other than Valkanas' because it concerns a breach of a contract for stock options.

1  finally, as a result of the concealment or suppression of the fact, the plaintiff must have sustained

2  damages. Nevada Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995)

3      With respect to fraudulent concealment, a duty to disclose arises from the relationship of

4  the parties. Dow Chem. Co. v. Mahlum, 970 P.2d 98, 110 (Nev. 1998). A fiduciary relationship,

5  for instance, gives rise to a duty of disclosure. Foley v. Morse & Mowbray, 848 P.2d 519, 525

6  (Nev. 1993).  Since the value of and rights incident to outstanding shares of stock are affected by

7  the conduct of directors, a fiduciary relationship exists in favor of the shareholders as to their

8  shares of stock. Horwitz v. Sw. Forest Indus., Inc., 604 F. Supp. 1130, 1134 (D. Nev. 1985) (citing

9  Smith v. Gray, 250 P. 369 (Nev. 1926)).

10      Here, Plaintiffs bring their fraudulent concealment claim against Harris and Daniels arising

11  from their fiduciary duty to Apcentive and Airborne stockholders respectively as corporate

12  directors and argue that their fraud should be imputed to Apcentive and Airborne. The Court finds

13  Plaintiffs fraudulent concealment claim is simply a repackaged derivative fiduciary duty claim

14  under a different label. Brunk v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark, 449 P.3d 1270 (Nev.

15  2019) (holding that regardless of how the stockholder plaintiff purported to characterize his claim

16  for fraud, the nature of the wrong alleged—that directors violated their duty to disclose—was a

17  derivative claim for breach of fiduciary duty). Moreover, Plaintiffs alleged harm ultimately arises

18  from a diminution in the value of corporate stock resulting from depreciation of corporate assets,

19  and such an injury is "a direct injury only to the corporation; it is merely an indirect or incidental

20  injury to an individual shareholder." Id. (citing 12B Fletcher Cyclopedia of the Law of

21  Corporations § 5913 (Sept. 2018 Update)).

22      The Court therefore analyzes Plaintiffs' first claim as a derivative claim for breach of the

23  fiduciary duty of corporate directors. A claim for breach of fiduciary duty customarily has three

24  elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of

25  the breach. Guzman v. Johnson, 483 P.3d 531, 538 (Nev. 2021). In addition, the Business

26  Judgment Rule (NRS 78.138(7)) requires the plaintiff to both rebut the of good faith and show a

27  breach of fiduciary duty involving intentional misconduct, fraud, or a knowing violation of the

28  law. Id. at 537.

- 27 -

The Court finds the Plaintiffs have successfully rebutted the good faith presumption of the business judgment rule, because their claims are based on Defendants' breach of fiduciary duty of disclosure amounting to fraudulent concealment. The Court therefore analyzes the merits of Plaintiffs claims arising from fraudulent concealment by Harris and Daniels in turn.

       1.   <u>Breach of Fiduciary Duty – Fraudulent Concealment Against Defendant Harris as Apcentive Director</u>

Before proceeding to the merits, the Court must determine whether Plaintiffs, whose stock was converted from Apcentive to Airborne stock, have standing as current shareholders of Airborne to bring their derivative claims against Harris and Apcentive, given that they are no longer Apcentive shareholders. Because a derivative claim is brought on behalf of the corporation, a former shareholder does not have standing to assert a derivative claim. <u>Cohen v. Mirage Resorts, Inc.</u>, 119 62 P.3d 720, 732 (Nev. 2003). The Nevada Supreme Court looks to standards articulated by Delaware courts in determining standing to bring a derivative action. <u>See e.g.</u>, <u>In re Amerco Derivative Litig.</u>, 252 P.3d 681, 697 (Nev. 2011). Delaware courts maintain that the right to bring a claim for breach of fiduciary duty, including derivatively, is a property right associated with a share of stock and freely assignable. <u>See e.g.</u>, <u>Quadrant Structured Prods. Co. v. Vertin</u>, 102 A.3d 155, 179 (Del. Ch. 2014) (collecting cases). Additionally, Plaintiffs have established they were stockholders of Apcentive at the time of the alleged breaches of fiduciary duty by Harris, which is sufficient to establish standing to bring a derivative claim under Delaware law. <u>Id</u>. (citing <u>Rosenthal v. Burry Biscuit Corp.</u>, 60 A.2d 106, 110 (Del. Ch. 1948)). The Court thus finds Plaintiffs' standing to sue Harris arising from their ownership of Apcentive stock survives the conversion of the stock to Airborne shares and arises from their current ownership of Airborne stock.

The Court finds undisputed that Harris concealed or repressed the following facts from Apcentive shareholders: Kabilafkas' and Daniels' history with and control over Apcentive, formerly Ample-Tee, including the fact that Apcentive was designed by Daniels and Kabilafkas as a shell corporation; that Harris was chosen by Daniels and Kabilafkas to purchase Apcentive and become its president; that Kabilafkas exerted ongoing control of Apcentive, including its bank

1    accounts, despite representing himself as a disinterested shareholder; that while he was working

2    as sole officer and director of Apcentive, he was also working fulltime at a car dealership. The

3    Court further finds undisputed that Harris concealed the fact that he was the sole officer, director,

4    and employee of Apcentive while M. De Mos was represented on marketing materials as

5    Apcentive's CEO.

6         The Nevada Supreme Court has not addressed the standard for what constitutes "material"

7    information in the context of a shareholder derivative fraudulent concealment claim wherein, as

8    here, the plaintiffs attest they would have acted differently—and specifically, would not have

9    invested in Apcentive by purchasing Apcentive securities—had they known about the above

10   concealed facts. In a diversity case, if the state's highest court has not decided an issue, it is the

11   responsibility of the federal courts to predict "how the state high court would resolve it." Albano

12   v. Shea Homes Ltd. P'ship, 634 F.3d 524, 530 (9th Cir. 2011). The Court thus predicts how the

13   Court would resolve the standard for materiality in this context.

14        The Court finds Plaintiffs' claim is analogous to a federal securities fraud claim in violation

15   § 10(b) of the Securities Exchange Act, which requires the following elements: (1) a material

16   misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

17   misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

18   misrepresentation or omission; (5) economic loss; and (6) loss causation.'" ESG Cap. Partners, LP

19   v. Stratos, 828 F.3d 1023, 1032 (9th Cir. 2016) (quoting Thompson v. Paul, 547 F.3d 1055, 1061

20   (9th Cir. 2008)). Nevada has recognized a policy of ensuring state law securities fraud claims are

21   coordinated with the interpretation and administration of related federal laws and regulations. Sec'y

22   of State v. Tretiak, 22 P.3d 1134, 1141 (Nev. 2001). The Court thus predicts that the Nevada

23   Supreme Court would look to federal precedent in determining the standard for what constitutes

24   "material" facts in connection with a fraudulent concealment claim involving the sale of securities.

25        Under a § 10(b) claim "even if a statement is not false, it may be misleading if it omits

26   material information." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1008 (9th Cir. 2018).

27   "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable

28   investor would have acted differently if the misrepresentation had not been made or the truth had

been disclosed." Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005). The Court finds that a reasonable investor would have acted differently had the above facts concealed by Harris been disclosed because the facts would have indicated to Plaintiffs that Apcentive was controlled by unaccountable individuals and Apcentive's only director was engaged in deception. In light of such facts a reasonable investor would not have purchased stock in Apcentive.

The Court further finds there is no genuine dispute of material fact as to whether Harris intentionally concealed the above facts with the intent to induce Plaintiffs to invest in Apcentive. See Nevada Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995) (finding that a fraudulent concealment claim under Nevada law requires the defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than he would if he knew the fact). Questions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment. Braxton-Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985). However, where the palpable facts are substantially undisputed, such issues can become questions of law which may be properly decided by summary judgment. See Fonda v. Gray, 707 F.2d 435, 438 (9th Cir. 1983). But summary judgment should not be granted where contradictory inferences may be drawn from such facts, even if undisputed. United States v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970).

Harris has not produced evidence sufficient to dispute the fact that he knowingly concealed the above facts. Nor has he attested that he did not act with the intent to defraud Plaintiffs. In his deposition, he indicated that Apcentive marketing materials containing fraudulent misrepresentations, including that M. De Mos was CEO while no mention was made of Harris as the company's sole director and officer, were made for the purposes of attracting investors including Plaintiffs. The Court finds that a reasonable factfinder could only infer from the substantially undisputed facts here that Harris acted with the intent to induce Plaintiffs to invest in Apcentive.

The Court also finds that there is no genuine dispute that Plaintiffs actually relied on the misrepresentations by Harris. See Nevada Power Co., 891 F. Supp. 1406 at 1416 ("[A] sufficient

1    showing that the fraud victim would have acted differently if there had not been fraudulent

2    concealment is also a required element.") (citing Blanchard v. Blanchard, 839 P.2d 1320, 1322

3    (Nev. 1992). The standard under Nevada law is subjective and plaintiff dependent. Plaintiffs have

4    produced uncontroverted declarations that they would not have become investors in Apcentive had

5    they known of the above concealed facts. Therefore, the Court finds there is no genuine dispute

6    that Plaintiffs actually relied on Harris' fraudulent concealment in investing in Apcentive.

7        Finally, the Court finds that there is a genuine dispute of fact as to the damages Plaintiffs

8    sustained as a result of Harris' fraudulent concealment. The damages element of a Nevada common

9    law fraudulent concealment claim requires that "the damages alleged must be proximately caused

10   by reliance on the original misrepresentation or omission." Nelson v. Heer, 163 P.3d 420, 426

11   (Nev. 2007). Proximate cause limits liability to foreseeable consequences that are reasonably

12   connected to both the defendant's misrepresentation or omission and the harm that the

13   misrepresentation or omission created. Id. Proximate cause also requires that causation be

14   "unbroken by any efficient intervening cause." Mahan v. Hafen, 351 P.2d 617, 620 (Nev. 1960).

15       Plaintiffs allege that the harm they suffered is the ultimate loss of value of their investment

16   in Apcentive, and that this loss in value was the result of the acts of other Defendants amounting

17   to a "pump and dump" scheme. But this is insufficient to establish that Harris' concealment

18   specifically proximately caused the loss in value of Airborne stock, because, by Plaintiffs own

19   admission, there are multiple intervening and superseding causes of the ultimate diminution in

20   Airborne stock value. Bower v. Harrah's Laughlin, Inc., 215 P.3d 709, 725 (Nev. 2009) ("When a

21   third party commits an intentional tort or a crime, the act is a superseding cause, even when the

22   [liable] party created a situation affording the third party an opportunity to commit the tort or

23   crime"). The alleged intentional torts of the other Defendants, including Kabilafkas, who

24   purportedly directed the "pump and dump" scheme, all occurred *after* Plaintiffs' Apcentive stock

25   was converted to Airborne stock, and Harris was no longer involved in Airborne's operations.

26   Therefore, the Court finds there is a triable issue as to whether Harris' fraudulent concealment

27   proximately caused the ultimate diminution in value of Airborne stock precludes a finding on

28   summary judgment that Harris' fraudulent concealment caused the harm suffered by Airborne

1    stockholders.

2              2.   Harris' Fraudulent Concealment is Imputed to Airborne

3         Under Nevada law, the knowledge of an officer or agent is imputed to the corporation when

4    the agent obtains the knowledge "while acting in the course of his employment and within the

5    scope of his authority, and the corporation is charged with such knowledge even though the officer

6    or agent does not in fact communicate his knowledge to the corporation." Strohecker v. Mut. Bldg.

7    & Loan Ass'n of Las Vegas, 34 P.2d 1076, 1077 (Nev. 1934) (quotation omitted); see also Bates

8    v. Cottonwood Cove Corp., 441 P.2d 622, 624 (Nev. 1968); Restatement (Third) of Agency § 5.03.

9    This is so because a corporation can acquire knowledge or receive notice only through its officers

10   and agents, and the law presumes that an agent will disclose all information to its principal.

11   Strohecker, 34 P.2d at 1077. Under basic corporate agency law, the actions of corporate agents are

12   imputed to the corporation.  In re Amerco Derivative Litig., 252 P.3d 681, 695 (Nev. 2011).

13        The rationale for imputing an agent's acts to the corporation is to encourage corporate

14   managers to carefully select and monitor those who are acting on the corporation's behalf. Id. at

15   695. However, if an agent is acting on his own behalf, the agent's acts will not be imputed to the

16   corporation. Keyworth v. Nevada Packard Co., 186 P. 1110, 1113 (Nev. 1920). This is commonly

17   referred to as the "adverse interest" exception to the usual rule that an officer's or director's acts

18   and knowledge are imputed to the corporation. Id. Under Nevada law, the "adverse interest"

19   exception requires that the agent's actions must be completely and totally adverse to the

20   corporation to invoke the exception, and this exception is very narrow. In re Amerco, 252 P.3d at

21   695.

22        The Court does not find from the undisputed facts that Harris actions were completely and

23   totally adverse to the interests of Apcentive, therefore his knowledge and acts are imputed to

24   Apcentive.

25             3.   Breach of Fiduciary Duty – Fraudulent Concealment Against Defendant
                   Daniels
26

27        Daniels has asserted no evidence in opposition to Plaintiffs' Motion for Summary

28   Judgment and specifically informed the Court that he takes no position. The Court thus finds the

following assertions of fact as to Daniels undisputed. Heinemann v. Satterberg, 731 F.3d 914, 917

(9th Cir. 2013) ("if a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact . . . the court may. . . consider the fact undisputed for purposes of

the motion . . .") (citing Fed R. Civ. P. 56(e)(2)). The Court finds undisputed that Daniels concealed

or repressed the following facts from Plaintiffs as Airborne shareholders: his relationship with

Kabilafkas and his and Kabilafkas' involvement in the acquisition of Airborne, formerly Ample-

Tee; that he and Daniels designed Apcentive as a shell corporation; that he and Kabilafkas

appointed Harris as Apcentive's sole director; that Kabilafkas had a history with and control over

Apcentive and Airborne leading up to Apcentive's purchase of Airborne's IP; as of October 20,

2015 that the IP had been valued by DS Enterprises at $0 and that the ability to raise the capital

required to bring the product to market before the patent's expiration was deemed "unlikely." The

IP valuation was not disclosed to shareholders until April 9, 2018 through a 10-Q filing.

Consistent with the standard set forth above, the Court finds that the concealed facts are

material because a reasonable investor would have acted differently had these facts been disclosed.

Perhaps most importantly, had the facts concealed by Harris been disclosed, they would have

indicated to a reasonable investor that the IP purchase raised conflict of interest and accountability

issues, since Kabilafkas, had control over both Apcentive and Airborne and was thus involved in

both sides of the transaction. A reasonable investor would likely take action if made aware of such

facts.

The Court further finds there is no genuine dispute of material fact as to whether Daniels

intentionally concealed the above facts with the intent to induce Plaintiffs to act differently than

they would had the facts been disclosed. See Nevada Power, 891 F. Supp. at 1415. As the Court

found with Harris, although questions involving a person's state of mind are generally factual

issues, Harris has presented no evidence to dispute that he intentionally concealed material facts

from Airborne shareholders and has not taken a position on summary judgment. The Court finds

no contradictory inference can be drawn from the undisputed facts other than that Daniels acted

intentionally to prevent Plaintiffs from becoming aware of the problematic nature of the IP

transaction. See Fonda, 707 F.2d at 438; Perry, 431 F.2d at 1022.

The Court also finds that there is no genuine dispute that Plaintiffs would have acted differently had Daniels not engaged in fraudulent concealment. Plaintiffs have produced uncontroverted declarations that they would not have become investors in Apcentive had they known about Kabilafkas and Daniels history and Kabilafkas' control over Apcentive and Ample-Tee/Airborne.

Finally, the Court finds that there is a genuine dispute of fact as to the damages Plaintiffs sustained as a result of Daniels' fraudulent concealment. As with Harris, the Court finds Plaintiffs have not produced evidence sufficient to find that Daniels' concealment proximately caused the diminution in Airborne's stock value. Plaintiffs sole evidence in support of damages is their expert witness' opinion that the loss in value was caused by Kabilafkas' "pump and dump" scheme. This is not sufficient because it is a *theory* of causation that Defendants dispute, and because that theory relies on inferences from the evidence that Daniels was a knowing participant in the scheme, and that the scheme caused the plumet in Airborne's share value. Plaintiffs' reliance on the judgement in the SEC Action and Daniels' criminal indictment as evidence that his decisions were "in furtherance of an indisputable fraudulent scheme" are unavailing because Plaintiffs have not established issue preclusion applies to Daniels. Moreover, the Court finds a factfinder could draw contradictory inferences from the evidence as to what caused the diminution in Airborne's share value, such as that the loss in stock value was caused by other non-fraudulent business decisions or market factors.

4. <u>Whether Daniels' Fraudulent Concealment is Imputed to Airborne</u>

As with Daniels, the Court finds that the narrow "adverse interest" exception does not apply because the undisputed facts do not show that he was acting completely and totally adverse to Airborne's interests, therefore Daniels' fraudulent concealment can be imputed to Airborne.

**ii.  *Claim 2: Breach of Fiduciary Duty Against Warren, Daniels, J. De Mos***

As discussed above, the Court finds Plaintiffs fraudulent concealment claim against Daniels is a repackaged breach of fiduciary duty claim against him. Accordingly, the Court incorporates the above findings and analysis as to Daniels with regards to Plaintiffs second claim against him.

As to Warren and J. De Mos, the Court finds Plaintiff have failed to establish sufficient undisputed evidence that Warren and J. De Mos breached their fiduciary duties through intentional misconduct, fraud, or a knowing violation of the law, as required to overcome the business judgment rule. Guzman, 483 P.3d at 537.

Plaintiffs' sole citation to specific evidence regarding Warren's, as Airborne CEO, alleged breach of fiduciary duty is that he did not have an explanation for why authorizing the Airborne board to effect five reverse splits of common stock would be a measure to save the company. A jury may find from this that Warren was unreasonable or careless as CEO, but that is not sufficient to show intentional misconduct, fraud, or a knowing violation of law. Whether Warren engaged in such conduct, or, as Plaintiffs allege, allowed Kabilafkas to engage in a "pump and dump" scheme, is therefore a triable issue of fact.

Likewise, Plaintiffs' sole citation to specific evidence of Jason De Mos', as Airborne's Vice President of Business Development and Aviation Compliance, breach of fiduciary duty is that he provided marketing materials to Ashton Kutcher regarding Airborne which discussed the IP purchase, before the 10-Q public disclosure was made. As with Warren, while this fact may be sufficient to show J. De Mos' knowledge of the IP purchase, this fact alone is insufficient to render undisputed that he engaged in intentional misconduct, fraud, or a knowing violation of law, especially given that Plaintiffs have not established that in his role at Airborne he had a duty to disclose material information to shareholders analogous to the duty of disclosure of corporate directors.

### iii. *Claim 3: Aiding and Abetting Breach of Fiduciary Duty Against Harris and Kabilafkas*

Nevada adopts the standard for aiding and abetting breach of fiduciary duty as established in Delaware, which requires that four elements be shown: (1) a fiduciary relationship exists, (2) the fiduciary breached the fiduciary relationship, (3) the third party knowingly participated in the breach, and (4) the breach of the fiduciary relationship resulted in damages. In re Amerco, 252 P.3d at 702. "Knowing participation in a . . . fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach. In some

circumstances, the terms of the negotiated transaction themselves [may be] so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." Gatz v. Ponsoldt, 925 A.2d 1265, 1276 (Del. 2007).

The Court incorporates the above analysis as to Daniels' breach of fiduciary duty through fraudulent concealment, and Harris' knowledge of Daniels history with Kabilafkas, Apcentive, and Airborne, which the Court finds both Harris and Daniels fraudulently concealed. The Court further incorporates its finding that Harris acted with fraudulent intent in concealing the information regarding Daniels. However, as discussed above, the Court does not find undisputed that Harris knowingly participated in Daniels' breaches which occurred after Plaintiff's Apcentive stock was converted to Airborne, because it is undisputed that Harris ceased being involved in Airborne after the conversion. Likewise, the Court finds that Plaintiffs have failed to establish causation for the purposes of damages as undisputed.

The Court, however, finds undisputed that Kabilafkas knowingly participated in the breaches of fiduciary duty through fraudulent concealment of both Harris and Daniels, because Kabilafkas has produced no evidence sufficient to create a genuine dispute that he exerted control over Apcentive through Harris, while that involvement was concealed from shareholders, and that he acquired Airborne with Daniels and the nature of that acquisition was concealed form shareholders.

Nevertheless, the Court denies Plaintiffs' motion as to Kabilafkas because Plaintiffs have not established causation and damages, for the same reasons discussed above with regards to Plaintiff's first claim.

### iv. *Claim 6: Intentional Interference with Contractual Relations by Plaintiff Valkanas Against Defendants Daniels, Harris, and Kabilafkas*

In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. J.J. Indus., LLC v. Bennett, 71 P.3d 1264, 1267 (Nev. 2003).

The Court finds undisputed that the Consulting Agreement between Valkanas and

Apcentive was a valid contract. The contract had an eighteen-month term, and provided both cash and stock option compensation to Valkanas based on the number of shareholders he referred through private placement to Airborne. The stock options had a three-year expiration date. Before the end of the contract term, Apcentive's IP had been transferred to Airborne. The Court further finds undisputed that Daniels, Harris, and Kabilafkas knew of the contract. The Court finds, however, that it is not undisputed that Daniels, Harris, and Kabilafkas took acts to disrupt the contract with the intent or design of doing so. Indeed, Plaintiffs argue that the Defendants end goal was a "fraudulent pump-and-dump scheme" which diminished the value of Apcentive stock, and the Consulting Agreement was an afterthought. Therefore, whether Defendants acted with the requisite intent to interfere in Valkanas' contract with Apcentive is a triable issue of fact.

### v. *Claim 7: Valkanas' Seventh Claim for Breach of Contract Against Defendant Apcentive*

A breach-of-contract claim requires (1) proof of a valid contract, (2) performance or excuse of performance by the non-breaching party, (3) breach by the defendant, (4) and damages. Hosp. Int'l Grp. v. Gratitude Grp., LLC, 387 P.3d 208 (Nev. 2016).

As discussed above, the Court finds a valid contract existed in the written Consulting Agreement entered into by Valkanas, on behalf of KEET Trust, and Apcentive. Pursuant to the terms of the written agreement, Valkanas, through KEET Trust, was entitled to commission and stock options which immediately vested for every share purchased by investors he referred to Apcentive through private placement, at the price the investors purchased the stock, with a three-year expiration date to exercise the options. It is undisputed that Valkanas' performed the contract by referring investors to Apcentive and received the full cash payment he was entitled to per the agreement. It is further undisputed that he did not exercise the stock options when they immediately vested. It is undisputed that in or around February 2017, Valkanas' spoke with Kabilafkas and requested a letter from Apcentive confirming the number of options he would receive under the consulting agreement. He was informed that Airborne, "the new company" would not honor the consulting agreement and was made aware for the first time of the Airborne purchase of Apcentive's IP. Valkanas and Kabilafkas then engaged in subsequent negotiations for

a stock purchase agreement of Airborne stock, but no agreement was reached.

Based on the undisputed facts, the Court does not find that Apcentive breached the contract. Nothing from the record indicates that Valkanas could not have exercised his stock options in Apcentive prior to the three-year expiration date. In his conversation with Kabilafkas, Kabilafkas noted Airborne would not honor the consulting agreement, but Airborne was not a party to the agreement. Although the IP transaction may have rendered Valkanas' options in Apcentive worthless, a stock option is not a promise that the stock will be worth a certain value—indeed the risk the stock will lose its value is inherent to the bargained-for consideration. Moreover, Valkanas' negotiations with Kabilafkas could not have affected the contract, because Kabilafkas was not an agent of Apcentive and was not a party to the contract. Neither are the negotiations between Kabilafkas and Valkanas admissible as evidence to change or contradict the terms of the written consulting agreement. Ringle v. Bruton, 86 P.3d 1032, 1037 (Nev. 2004) ("The parol evidence rule does not permit the admission of evidence that would change the contract terms when the terms of a written agreement are clear, definite, and unambiguous.").

### vi. *Benefit-of-the-Bargain and Consequential Damages*

Although the Court has found the element of damages in all of Plaintiffs claims is an issue for trial, the Court hereby limits the damages Plaintiffs can seek to prove. The Court finds that Plaintiffs have not established they are entitled to benefit-of-the-bargain damages. Under Nevada law, the measure of damages for fraudulent concealment can be determined in one of two ways. Leigh-Pink v. Rio Properties, LLC, 512 P.3d 322, 326 (Nev. 2022) (citations omitted). The first allows the defrauded party to recover the benefit-of-his-bargain, that is, the value of what he would have if the representations were true, less what he had received. Id. The second allows the defrauded party to recover only what he has lost out-of-pocket, that is, the difference between what he gave and what he actually received. Id.

Plaintiffs seek to obtain a benefit-of-the-bargain remedy for harms arising from Defendants' alleged securities fraud—namely the loss in value of the Apcentive stock they invested in. They claim the benefit-of-the-bargain measure is based on the 2020 projected stock value that was contained in Apcentive's marketing materials, which they relied upon in investing

1   in Apcentive. The Court finds that "out-of-pocket" damages is the appropriate measure of damages

2   in this case because the argument supporting benefit-of-the-bargain is entirely speculative and

3   depends on a chain of events that never occurred. By the marketing materials' own terms, the

4   projected value was contingent on Apcentive's ability to raise over $500 million in capital by year

5   three, and there was a significant risk that it would be unable to do so. Plaintiffs cannot claim they

6   would have received the projected stock value if Apcentive's representations were true, because

7   Defendants did not represent that projected value as a certainty.

8        It is precisely due to the speculative nature of benefit-of-the-bargain damages that in federal

9   securities fraud actions in the Ninth Circuit, the generally employed measure of damages is out-

10  of-pocket damages, or "the difference between the value of what was received and the fair value

11  of what one would have received had there been no fraudulent conduct." Strategic Diversity, Inc.

12  v. Alchemix Corp., 666 F.3d 1197, 1208 (9th Cir. 2012). Consequential damages may also be

13  awarded if proved with sufficient certainty. Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d

14  1017, 1030 (9th Cir. 1999).

15       Given the speculative nature of the benefit-of-the-bargain damages in this case, the Court

16  finds the appropriate measure of damages is Plaintiffs' out-of-pocket damages, that is, the price

17  they paid for Apcentive stock minus the value of their Airborne stock, plus any consequential

18  damages they can prove with sufficient certainty. The Court finds the record is not conclusive as

19  to how much Apcentive stock each Plaintiff purchased and for what price. Further, Plaintiffs have

20  failed to provide sufficient evidence on summary judgment that they sustained consequential

21  damages by purchasing Airborne stock on the open market in an effort to mitigate their losses.

22  Plaintiffs must connect consequential damages to the discovery of Defendants' fraudulent

23  concealment, and the record does not establish that causal connection.

25  **VI.    CONCLUSION**

26       For the foregoing reasons, **IT IS ORDERED** Plaintiffs' Motions to Strike (ECF No. 268,

27  270) are **DENIED**.

28       **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (ECF

1    No. 274) is **GRANTED** in part and **DENIED** in part.

2        **IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal (ECF No. 321) is **DENIED**.

3    Plaintiffs shall refile the documents currently under seal with redactions only as to the personal

4    financial information of Plaintiffs which is not relevant to their damages in this case.

5        **IT IS FURTHER ORDERED** that the parties shall file an amended joint pretrial order by

6    **June 2, 2025**.

7

8    **DATED:** March 31, 2025.

9

10

11    _____
      **RICHARD F. BOULWARE, II**
12    **UNITED STATES DISTRICT JUDGE**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28